UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO._____

| | |
|---|---|
| US AIRWAYS, INC., <br><br> Plaintiff, <br><br> v. <br><br> US AIRLINE PILOTS ASSOCIATION and MICHAEL J. CLEARY, <br><br> Defendants. | **COMPLAINT FOR INJUNCTIVE RELIEF** |

Plaintiff US Airways, Inc. ("US Airways" or "the Company"), for its Complaint herein against Defendants US Airline Pilots Association ("USAPA") and Michael J. Cleary ("Cleary"), states as follows:

<u>**INTRODUCTION**</u>

1. US Airways files this lawsuit under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (the "RLA"), against USAPA and its officers and members to prohibit them from engaging in an ongoing, unlawful pilot slowdown campaign. The purpose of USAPA's campaign is to cause nationwide flight delays and cancellations in order to put pressure on US Airways in its current collective bargaining negotiations with USAPA. USAPA recently intensified its campaign, resulting in a significant change in pilot behavior, which in turn is now disrupting US Airways' operations and the travel plans of many thousands of members of the public — primarily at Charlotte and US Airways' other east coast hubs. These actions are illegal.

2. The status quo obligation in Section 2, First, of the RLA not only prohibits USAPA from instigating or encouraging a slowdown, it also requires that USAPA make all reasonable efforts to prevent or stop a slowdown that is occurring. USAPA has utterly failed to

- 1 -

meet its obligation. The lead Court of Appeals decisions addressing this status quo obligation all arise in the identical context of a union attempting to put pressure on an airline in contract negotiations and expressly confirm that, under the facts presented here, an injunction must issue.

3. Indeed, as confirmed by the applicable legal precedent USAPA's attempt to put pressure on US Airways in ongoing contract negotiations by disrupting operations is a blatant violation of its status quo obligations under Section 2, First, of the RLA. USAPA is directly instigating the illegal slowdown by encouraging pilots to delay flight departures, not complete certain training requirements, decline to fly on the basis of fatigue, increase maintenance write-ups, and generally slow down in the performance of their duties — and also by threatening to expose and retaliate against those pilots who do not participate in the slowdown. Although USAPA is encouraging pilots to change their behavior under the guise of "safety," USAPA's own communications confirm the true purpose of its campaign is illegally to slowdown US Airways' operation in order to gain leverage in contract negotiations. For example, USAPA encourages pilots to "Fly Safe" and "slow it down!" in a publication describing what it will take for US Airways' pilots to win their "battle" for a new contract. And USAPA's Strike Preparedness Committee — not its Safety Committee — issued a publication stating that "it is time for us to make a concise and powerful statement that we will no longer tolerate unfair working conditions" by "MEET[ING] OR EXCEED[ING]" all "safety standards" "in every single decision that we make" and concluded by stating that "[a] storm approaches."

4. The applicable case law recognizes that a union's initiation and repeated emphasis on safety in the midst of collective bargaining negotiations is code for a slowdown. *See, e.g.*, *United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers*, 243 F.3d 349, 355-57 (7th Cir. 2001) (publications stressing "safety first" and encouraging union members to "work

safe" are "commonly recognized signals . . . for a work slowdown"). This is an intuitive point, especially as to pilots. US Airways' pilots are highly trained professionals and do not need to be told that they should not fly an unsafe aircraft — they know that. So when USAPA repeatedly emphasizes safety to its members in the midst of labor negotiations, pilots understand that USAPA is telling them to slowdown in order to disrupt the operation. This is particularly so where, as here, USAPA does so while also telling pilots there are "strong implications beyond just safety" and "flying safe" is necessary to get the contract they deserve. The true purpose of USAPA's campaign is further confirmed by the fact that the only participants are the "East" pilots. The East pilots worked for US Airways prior to its merger with America West Airlines in 2005, and are domiciled in Charlotte, D.C., and Philadelphia, and their allegiance to USAPA is generally stronger than that of the "West pilots," who worked for America West prior to the merger, and are domiciled in Phoenix.

5. USAPA's slowdown campaign is having the union's intended effect: the change in East pilot behavior has dramatically impacted numerous aspects of US Airways' operations leading to flight delays and cancellations, particularly at its Charlotte hub (US Airways' largest operation). These changes are all "statistically significant," meaning that they cannot be explained by chance. For example, since May 1, 2011, the percentage of the Company's flights flown by East pilots that arrive at their scheduled arrival time has dropped by more than 11 percentage points (after controlling for weather and other factors). Based on conventional statistical analysis, the odds that this drop in on-time arrivals by East pilots is random in nature in less than 1% (i.e., it is more than 99% certain that this is the result of concerted activity). When there is an increase in late arriving flights, there is a subsequent increase in the number of passengers who miss their connecting flights and/or whose bags do not make it to a connecting

flight.  For example, since May 1, the number of bags that do not make it onto a passenger's connecting flight has increased by more than 45% for every 1,000 connecting passengers at Charlotte — while operations remain normal in Phoenix.

6.     East pilots are causing these disruptions by engaging in the specific delay tactics encouraged by USAPA, such as slowing down when they taxi aircraft.  The average historical "taxi-in" time (when a pilot taxis the aircraft to the gate after landing) and "taxi-out" time (when a pilot taxis the aircraft from the gate to take off) for East pilots have increased dramatically since May 1.  Also, there has been a similar dramatic increase in flight departure delays attributed to East pilots — another tactic encouraged by USAPA.  Historically, 1.31% of US Airways' flights flown by East pilots are delayed for reasons attributable to those pilots.  Since May 1, however, that rate has more than doubled to 2.85%.  During this same time, these operational metrics have been within normal ranges for West pilots.

7.     The requirements for issuance of a preliminary injunction are plainly met.  As to the merits, USAPA's directives to slow down under the guise of safety cannot be seriously disputed — and those directives are patent violations of USAPA's obligations under Section 2, First, which prohibit a union from instigating or encouraging a slowdown, and also require a union to make all reasonable efforts to prevent or stop a slowdown by its members.

8.     The irreparable injury showing that is typically required to obtain injunctive relief does not apply under the RLA.  *See Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 303-04 (1989).  But even if irreparable injury were a requirement, it is satisfied here: USAPA and the East pilots' actions have caused, on average, nine to ten flight cancellations a day since May 1.  This means that the travel plans and daily lives of approximately 1,173 passengers a day are being disrupted by USAPA's campaign — or 105,500 members of the

- 4 -

traveling public to date. This harm to the public alone warrants issuance of a preliminary injunction. Cancellations of this magnitude also directly translate into incalculable irreparable harm to US Airways' customer goodwill and business reputation in an industry in which customers have a choice and make decisions based on reliability and reputation. And there can be no claim of harm to USAPA or its members in issuing an injunction because it would simply prohibit them from engaging in illegal activity.

9.     US Airways has attempted to resolve this dispute by repeatedly putting USAPA on notice of its violations of the RLA and demanding that it make all reasonable efforts to stop the slowdown as required by the RLA. In response, USAPA has only intensified its campaign, thus requiring US Airways to seek injunctive relief. For the reasons set forth below, in this situation, Section 2, First, of the RLA requires the issuance of a preliminary and permanent injunction.

## JURISDICTION

10.     This action arises under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* The Court has jurisdiction over this action under 28 U.S.C. § 1331.

## VENUE

11.     Venue is proper within the Western District of North Carolina, pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the Company's claims occurred in this jurisdiction.

# THE PARTIES

**Plaintiff US Airways**

12.      Plaintiff US Airways is a commercial air carrier, headquartered in Tempe, Arizona, with domestic and international operations.  US Airways is a "common carrier by air" as defined in the Federal Aviation Act of 1958 and a "carrier" as defined by the RLA.

13.      In May 2005, the respective holding companies of America West Holdings Corp. ("America West") and US Airways announced the merger of America West and US Airways with an effective date of September 27, 2005.  Under the Merger Agreement, US Airways Group, Inc., which was then operating under Chapter 11 bankruptcy protection, would be reorganized, and the reorganized entity, known as "US Airways," would own and control the former America West and US Airways.

**Defendants USAPA and Cleary**

14.      USAPA is an independent labor union, with its headquarters in Charlotte, North Carolina.  USAPA has been the certified collective bargaining representative under the RLA of pilots at US Airways since April 18, 2008.  USAPA has four officers:  a President, Vice-President, Executive Vice-President, and Secretary-Treasurer of USAPA.  USAPA maintains a large number of standing committees such as the Safety Committee and Strike Preparedness Committee.  Defendant Michael J. Cleary ("Cleary") is the President of USAPA.

## BACKGROUND OF THE DISPUTE

**Background Regarding the East and West Pilots' Seniority Dispute and the Parties'
Contract Negotiations**

15.      The disruptions to US Airways' operations are a result of the concerted actions of the East pilots only.  This unique situation arises from a protracted seniority dispute between the East and West pilots.  At the time of the 2005 merger of US Airways and America West, the East

pilots (who were employed by pre-merger US Airways) and the West pilots (who were employed by pre-merger America West) were both represented by the Air Line Pilots Association ("ALPA").

The Seniority Dispute

16.     In connection with the merger, the East pilots, the West pilots, and the merging companies agreed, in a collectively-bargained multilateral agreement (the "Transition Agreement"), that the pilot workforces of the two airlines would be combined. The Transition Agreement supplements and amends the collective bargaining agreements that existed at the time of the merger. Those same collective bargaining agreements are currently in effect. Under the RLA, collective bargaining agreements do not expire, but become "amendable" by the parties and remain in force until the RLA negotiation/mediation process is completed. The collective bargaining agreement between US Airways and the West pilots became amendable on December 30, 2006, and the collective bargaining agreement between US Airways and the East pilots became amendable on December 31, 2009. A dispute arose, however, between the East and West pilots as to their relative placement on an integrated pilot seniority list. The East pilots and the West Pilots, represented by separate counsel, arbitrated their seniority dispute before a neutral arbitrator, George Nicolau.

17.     Although US Airways was not a party to that arbitration, it agreed in the Transition Agreement to accept the resulting integrated seniority list so long as certain conditions were satisfied. The arbitrator issued an award, referred to as the "Nicolau Award," in May 2007. According to ALPA's constitution, the results of the arbitration were to be "final and binding" as between the East pilots and the West pilots.   The East pilots perceived the Nicolau Award to be less favorable to them as a group than the "date-of-hire" integrated seniority list they had sought

from Arbitrator Nicolau. Pursuant to the Transition Agreement, ALPA presented to the Company the integrated seniority list based on the Nicolau Award, and US Airways was obligated to accept that seniority list. US Airways did so in late 2007.

The Formation of USAPA

18. In response to the Nicolau Award, the East pilots formed a new labor union, USAPA, whose constitution expressly mandates a "date-of-hire" integrated seniority list and prohibits implementation of the Nicolau Award. The East pilots significantly outnumber the West Pilots and, in that context, USAPA won an election among all of the pilots and was certified as the labor union for both the East and West pilots on April 18, 2008. The West pilots allege that USAPA was formed solely for the purpose of evading the obligation to include the Nicolau Award in the collective bargaining agreement with US Airways. According to USAPA, the Nicolau Award, which directly conflicts with the "date-of-hire" seniority mandated by USAPA's Constitution, grants "super seniority to more junior West pilots" at the expense of more senior East Pilots. The West pilots, by contrast, regard the Nicolau Award as "an equitable integration of the seniority lists," and regard "a date-of-hire seniority list as inequitable."

The *Addington* Lawsuit

19. In 2008, following a dramatic spike in the price of fuel, US Airways announced that it would be forced to furlough pilots. Some of the pilots to be furloughed were West pilots, who would not have been subject to furlough if a single collective bargaining agreement ("CBA") incorporating the Nicolau Award were in place at the time. The West pilots brought suit in federal court in Phoenix against USAPA, asserting a claim for breach of USAPA's duty of fair representation based on its refusal to adopt the Nicolau Award in its negotiations with US Airways for a single CBA that would be applicable to the combined pilot workforce. *See*

*Addington v. US Airline Pilots Ass'n*, 2009 U.S. Dist. LEXIS 61724 (D. Ariz. July 17, 2009). A jury found that USAPA had violated its duty of fair representation because it "cast aside the result of an internal seniority arbitration solely to benefit the East Pilots at the expense of the West Pilots," and "failed to prove that any legitimate union objective motivated its acts." *Id.* at *23-24.

20.     USAPA appealed, and the Ninth Circuit reversed without reaching the merits, finding that the West pilots' action for breach of the duty of fair representation was not yet ripe. *See Addington v. US Airline Pilots Ass'n*, 606 F.3d 1174, 1179-80 (9th Cir. 2010).

Events Following the Ninth Circuit's Decision in *Addington*

21.     US Airways anticipated that the *Addington* case would provide clarification–one way or the other–regarding the legality of entering into an agreement with USAPA for a non-Nicolau seniority list. But, given the Ninth Circuit's ruling on ripeness, that clarification was not provided.

22.     After the Ninth Circuit issued its opinion, USAPA and the West pilots each insisted that US Airways take its side in the seniority dispute–or face dire consequences. The West pilots assert that the Ninth Circuit's opinion merely postpones a decision on their duty of fair representation claim and authorizes them to sue USAPA and US Airways if agreement is reached on a non-Nicolau seniority list. And their counsel has sent US Airways multiple letters threatening to sue US Airways under the RLA for, *inter alia*, "facilitat[ing]" or "assist[ing]" USAPA's breach of the duty of fair representation if US Airways accepted USAPA's seniority demands.

23.     USAPA, on the other hand, interprets the Ninth Circuit decision as authorizing agreement to a non-Nicolau seniority list and as specifically allowing it to insist on a "date-of-

hire" seniority list.  If US Airways rejects USAPA's seniority position and refuses to negotiate a non-Nicolau seniority list, USAPA has made clear that it will initiate a work stoppage at its "earliest opportunity."

24.     Faced with this Hobson's choice, in July 2010, US Airways filed a declaratory judgment action against USAPA and the class of West pilots seeking a judicial determination of the parties' rights and obligations.  That case, *US Airways, Inc. v. Addington*, No. 2:10-cv-01570-ROS, is currently pending in the District of Arizona.  USAPA moved to dismiss on ripeness grounds, and in June 2011, the court denied that motion, finding that the case was ripe because absent judicial relief, US Airways would be subject to a real threat of litigation by the West pilots, or a real threat of a strike following completion of the RLA negotiation process by the East pilots. *See Addington*,  No.2:10-cv-01570-ROS, Order Denying Motion to Dismiss, at 4-8 (D. Ariz. June 1, 2011).

The Parties' Contract Negotiations

25.     US Airways began negotiating with ALPA for a single CBA in November 2005. Those negotiations were not successful in part because the East pilots withdrew from the negotiations in August 2007 after issuance of the Nicolau Award.  Following USAPA's certification in April 2008, US Airways and USAPA began meeting regarding a single CBA in June 2008.  Since January 2010, these negotiations have been mediated by the National Mediation Board ("NMB").  The NMB has the unfettered authority to release the parties from negotiations if and when it determines that agreement cannot be reached, and, only following such a release (and a 30-day "cooling off" period), would USAPA be permitted to engage in a work stoppage.  In the current negotiations, USAPA continues to insist on a non-Nicolau

seniority list.  USAPA has repeatedly expressed its frustration with the length of the current

negotiations and the failure of the parties to reach agreement on a single CBA.

**The Evidence of USAPA's Encouragement of the Illegal Slowdown**

26.     There is significant and compelling evidence that USAPA is encouraging pilots to

engage in an illegal slowdown in order to put pressure on US Airways in these ongoing

negotiations, with much of the disruption in Charlotte.  USAPA is carrying out its illegal

slowdown campaign under the guise of "safety" — by encouraging pilots to alter the status quo

based on a series of communications that purport to promote safety.  USAPA has not always

stayed "on message," however, and its communications often reveal USAPA's true intent.

Through these communications, USAPA has made it clear to US Airways' pilots that USAPA

believes US Airways will accede to USAPA's bargaining demands — but only if the pilots

engage in an illegal slowdown that forces US Airways to do so.

**USAPA Links "Safety" and "Flying the Contract" to Obtaining Leverage in Contract Negotiations**

27.     While safety became the primary focus of USAPA's campaign in the fall of 2010,

USAPA tied "safety" and "flying the contract" to its efforts to obtain a new contract much

earlier.  "Flying the contract" is recognized as code for instructing pilots to adhere strictly to

every provision in the collective bargaining agreement and not waive any provisions in order to

put pressure on the airline.  *See*, *e.g.*, *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563

F.3d 257, 263 (7th Cir. 2009).  For example, on April 12, 2009, USAPA's Charlotte domicile

issued an update that addressed the status of contract negotiations, stating that USAPA must

"demand an industry standard contract."  The update then stated that obtaining an industry

standard contract "takes work from all of us; stay informed, and continue the campaign of

remaining Good Union Pilots."  Immediately after telling pilots that they would have to "work"

and be "Good Union Pilots" to get a new contract, USAPA then told pilots that they have "the latitude to stop the operation if in their mind safety standards are compromised."

28.     Similarly, in a December 18, 2009 publication issued by USAPA's Charlotte Domicile, just before the East pilots' labor contract became amendable on December 31, 2009, USAPA directly linked the "fight" for a new contract to "Fly[ing] Safe" and "flying the contract."

29.     And in February 2010, USAPA issued an update encouraging pilots to take other steps to slow down the operation: "Pilots are reminded to review FOM 1.3.4 Captains Authority: If the Captain is dissatisfied with any aspect of the aircraft's airworthiness and/or maintenance status, or if he is not sure the operation can be safety executed, then the operation will stop until he is completely satisfied.  Please remember we have 224 pilots on furlough.  Fly safely, Act Your Wage and be a Good Union Pilot."

**USAPA Attempts to Eliminate Voluntary Flying by Check Pilots**

30.     Following these early communications linking safety and "flying the contract" to contract negotiations, USAPA explicitly attempted to put pressure on US Airways by directing check pilots to reject voluntary flying.  Check pilots are pilots who also conduct periodic tests of other pilots required by the Federal Aviation Administration ("FAA").  Under the collective bargaining agreement governing East pilots, US Airways may employ a procedure of voluntary flight assignments known as "FCR flying" — which means Flying at Company Request — if the Company is unable to cover all its flights with regular or reserve pilots.  This is one of several processes that is used to staff "open flying" — that is, flights that do not have a pilot assigned to them, generally because the pilot originally assigned to the flight has called in sick — by offering that flight to a check pilot.

31.     Under status quo conditions, many US Airways check pilots will seek out this work because it allows them to increase their income.  Historically, US Airways has not had any difficulty finding check pilots to accept these voluntary flight assignments.

32.     USAPA's communications initially directed check pilots to refuse voluntary flight assignments.  USAPA then went a significant step further, however, by supporting "sanctions" against check pilots taking such assignments and making their names available to "outraged" pilots.  Specifically, in April 2010, USAPA informed its members that because "line pilots continue to express displeasure with . . . check airman [*sic*] flying at company request on days off," USAPA has "increase[d] its oversight of . . . Check Airmen that fly on their days off at company request . . . [and] that the names of pilots that participate in this activity [will] be published."  The April 2010 communication also indicated that a USAPA committee "will begin seeking feedback from our line pilots to determine your level of resentment against those pilots willing to 'help out' with understaffing issues when we have pilots on furlough . . . [and] soliciting your suggestions on other sanctions that may be appropriate to deter this activity."

33.     The Company's labor relations group did not learn about these communications until December 2010.  Shortly thereafter, US Airways sent a letter to Mike Cleary, USAPA's President, demanding that USAPA and each of its authorized committees comply with their legal obligations.  In response, USAPA did not agree to comply with its obligations and even argued that its campaign was somehow justified because it was motivated by a desire to minimize furloughs.  US Airways then made clear in an additional letter that the RLA contains no exception for status quo violations that are accomplished in order to minimize furloughs.  Notably, following USAPA's campaign, check pilots often do not accept FCR requests and this

flying has declined significantly (from an average of 7.5 flights per month to an average of 2.3 flights per month).

**USAPA Disrupts US Airways' Operations by Distributing False Safety Information Regarding the Airbus Fleet**

34.     In late November/early December 2010 (including over the Thanksgiving holiday weekend, one of the busiest travel periods of the year), USAPA issued a number of communications falsely advising pilots that small holes known as "inspection holes" on the underside of the flaps of certain aircraft (the Airbus A-319, A-320, and A-321) must be covered in order for the aircraft to be operated in accordance with requirements established by the FAA, and that this maintenance item could not be deferred.  When these aircraft are new and in proper repair, these inspection holes are covered with tape.  Under FAA regulations, an airline is entitled to defer maintenance on a variety of equipment items — known as "deferrable," "minimum equipment list," or "MEL" items — that do not affect flight safety.

35.     Specifically, on November 30, 2010, USAPA's Safety Committee Chairmen issued an "Airbus Safety Alert" stating that if covers were missing from these inspection holes it had an effect on the aircraft's airworthiness.  The publication stated that pilots are required to enter any missing inspection hole covers in the Flight Deck Maintenance Log (a manual found in every cockpit which is reviewed by the maintenance department for each flight).  USAPA's publication stated that while a missing inspection hole cover could not be deferred via the MEL process, the inspection holes could be temporarily repaired with tape, provided that a different permanent repair was completed within 48 hours.  It also stated that if a pilot were to fly an aircraft with a missing inspection hole cover, the pilot was "at risk from both a safety and [FAA] violation perspective."

36. The information contained in USAPA's November 30, 2010 Airbus Safety Alert was false. Moreover, at no time prior to USAPA's dissemination of this Safety Alert did USAPA confer with anyone from the Company to determine the actual requirements regarding the inspection hole covers. For issues related to specific aircraft, such as this, the manufacturer of the aircraft makes the determination and issues guidance as to whether there is any impact as to the airworthiness of the aircraft. The FAA does not go into that level of detail, and the manufacturer's guidance is controlling absent contravening guidance from the FAA. And as long ago as 2004, the Company was advised by Airbus (the manufacturer of the aircraft) that inspection hole covers on these aircraft did not create an airworthiness issue, and can be restored "at the next convenient opportunity." US Airways, however, self-imposed a restriction of 100 flight hours within which the repair should be made. Moreover, the permanent repair, contrary to USAPA's alert, is simply to re-apply tape over the inspection hole cover. That advice was also reconfirmed with the aircraft manufacturer following USAPA's alert. Thus, in response to USAPA's November 30, 2010 Airbus Safety Alert, the Company sent a message to all crewmembers on that same day in order to correct the misinformation disseminated by USAPA.

37. In response to the Company's message, on December 1, 2010, USAPA released an "Update on Airbus Safety Alert" that was sent to all pilots. This Alert also contained false information. The Alert claimed that, "[i]n response to [the Safety Committee's November 30 Alert], the Company has obtained relief to allow up to 100 flight hours of operation without the inspection ports being covered." But Airbus never suggested that inspection hole covers were in any way related to the airworthiness of an aircraft, and the Company never sought any relief to allow the aircraft to operate with the covers missing. The 100-hour flight restriction was implemented by the Company on its own accord.

38.     As a result of the misinformation from USAPA regarding the inspection hole covers, an inordinate number of pilots wrote up the Airbus aircraft for missing inspection hole covers in the FDML, and refused to operate scheduled flights until repairs (which could have been deferred, and under normal circumstances would have been deferred) had been made.  In all, the false communications issued by USAPA in late November/early December 2010 caused 19 flight delays totaling 1,047 minutes, with the average delay lasting 55 minutes.

39.     On December 23, 2010, US Airways wrote a letter to USAPA summarizing the Company's findings and conclusion that USAPA purposely deceived pilots into refusing to fly safe airplanes in order to cause disruptions to US Airways' flights.  The letter asked that the USAPA Safety Committee immediately retract and correct the November 30 and December 1 Safety Alerts.  USAPA refused to do so at that time — and still refuses.

**USAPA Commissions a "Safety Culture Survey"**

40.     In the fall of 2010, USAPA commissioned a "Safety Culture Survey" to be conducted by a third-party, Illumia Corporation.  The survey was conducted in October/November 2010.

41.     In December 2010, USAPA informed the Company that the Safety Culture Survey was completed and asked for a meeting with the Company.  On January 25, 2010, representatives of US Airways attended a meeting with USAPA and a representative of Illumia. At the conclusion of the meeting, US Airways was provided with a copy of the "abridged analysis of the survey results."

42.     After reviewing and considering the analysis, on February 11, 2011, Paul Morell, US Airways' Vice President, Safety & Regulatory Compliance, sent a letter to USAPA conveying the Company's belief that USAPA was inappropriately using the survey to

characterize pilots' concerns about seniority and contract negotiations as safety issues.  The Company's conclusion was driven in part by the make-up of the survey participants.  Although West pilots comprise 34% of US Airways' overall crew force, only 14% of the survey participants were West pilots — whose allegiance to USAPA is weak.  And nearly 50% of those pilots who responded to the survey are based in Charlotte, where USAPA's headquarters is located and ties to the Union are much stronger, even though just 29% of US Airways' pilots are based there.

43.     In its letter, the Company explained that, as USAPA knows, US Airways has implemented and invested very significant resources in numerous industry safety programs.  US Airways also is the industry leader in the FAA's Safety Management System (SMS) pilot program — a program developed in conjunction with the FAA to identify safety hazards and risks, develop risk mitigation strategies, and monitor their effectiveness.

44.     The Company also explained that, to the extent pilots have legitimate safety concerns, such concerns can and should be reported to US Airways through the reporting systems maintained specifically for that purpose — reporting systems of which USAPA is well aware and that its members have used effectively.  These reporting systems are extensive and robust.   And, by any standard, the Company's safety programs and reporting systems are effective and working.

**USAPA Confirms That It Is Using the Safety Survey as "Cover" to Engage in an Illegal Slowdown**

45.     USAPA's own publications confirm it is using the survey as a "cover" to engage in an illegal slowdown.  USAPA first made clear that its intent behind commissioning the "Safety Culture Survey" was something other than safety when, on September 30, 2010, before

the survey was even conducted, USAPA informed its members that its upcoming "Safety Culture Survey" would "have strong implications beyond just safety."

46.    And the real purpose behind the survey is confirmed in a March 1, 2011 publication issued by USAPA's Charlotte domicile, which includes comments made by USAPA's Safety Committee Chairman Thomas J. Kubik ("Kubik"), to USAPA pilots in Charlotte. In regards to the Safety Culture Survey, Kubik states:

- "This report gives us carte blanche authority to take back our airline"; and

- "Peer pressure is very important, our profession is under attack. Speak up to your fellow pilots and let them know they need to be good union pilots."

47.    A union "tak[ing] back [their] airline" has no relation to safety. And there is certainly no reason to encourage pilots to exert "peer pressure" on other pilots to be "good union pilots" in terms of operating a safe airline. But peer pressure to force each pilot to be a "good union pilot" is common in slowdown campaigns — and the reference to being a "good union pilot" has frequently been used by USAPA in its publications discussing contract negotiations.

48.    Notably, the same March 1, 2011 publication issued by USAPA's Charlotte domicile encourages pilots to fly "safe" and "slow it down!" in the middle of a discussion of what it will take for US Airways' pilots to win their "battle" for a new contract. That publication also states: "We can only prevail when we collectively demonstrate to Doug Parker [US Airways'] and his minions who actually is running this airline. The sooner this occurs, the sooner the fight to your contract will be over. . . . The throttles and flight controls are in our hands . . . Fly Safe, remain focused, stay healthy, and if rushed ….. slow it down!"

**USAPA Releases a Series of "Safety" Videos Encouraging the Illegal Slowdown**

49. USAPA then started circulating additional communications to pilots regarding "safety" issues, including a series of videos addressing on-time "pressure distractions," pilot fatigue as related to hotel and scheduling issues, MEL issues, and taxi issues. These communications demonstrate the concerted nature of the illegal slowdown as well as USAPA's orchestration of that illegal slowdown. Virtually all of these communications focus only on purported safety concerns that, in the opinion of USAPA, require US Airways' pilots to slowdown in the performance of their duties or otherwise could result in flight delays or cancellations. These videos show USAPA making direct efforts to change pilots' behavior in a manner that impacts the operation.

50. The first video, released on March 23, 2011, addresses on-time performance pressure and ground crews approaching aircraft. In the video, Kubik encourages pilots to delay pre-flight procedures by "notify[ing] the flight attendants that [they] have numerous pre-flight checks that cannot be disturbed." By lengthening the pre-flight process, a pilot can delay the takeoff of the flight — a common technique in slowdown campaigns recognized in the case law. The video continues: "[I]n order to make that happen, you are going to close the flight deck door and [ensure that it will remain closed] until you have completed your pre-flight checks. Make absolutely certain that the closed door is your signal to the flight attendants that the cockpit is sterile . . . Once [that] is complete, open the door. Any issues that have arisen during your sterile cockpit pre-flight duties can be handled once the flight deck is set up and ready to go."

51. Next, on March 30, 2011, USAPA's Safety Committee released a video addressing pilot fatigue. In the video, Kubik states: "[i]f you are fatigued, you are done flying . . . If you are a reserve pilot, don't accept a trip if you are fatigued. If you are called for a ridiculous pairing that you know will put you in a fatigued state, don't accept." The video also

explicitly states that: "When enough of our pilots fully understand this requirement, and more importantly, act upon this requirement, then our substandard hotel situation will disappear with a speed you likely thought was not possible."

52.     USAPA's Safety Committee released yet another video on April 4, 2011, directing pilots to change their normal behavior and not accept aircraft with MELs — much like it did in November 2010 with respect to inspection hole covers.  The video stated, in part, that:

"**Use your experience and judgment when confronted with an MEL.**  Do not accept one that puts you and your crew into the yellow and compromises safety.  Take all factors into consideration and never be intimidated by anyone whether from dispatch, maintenance, or the Chief Pilots' office.  Our safety culture is flawed, and we must put a stop to it.  **We** make the final call on the MEL items we accept.  Every item in the MEL is legal.  Not every item in the MEL is safe.  That is your decision, and your decision alone.  Make the call and allow us to back you up if you are harassed or pushed.  We must educate this management of our duties, our authority, and our total commitment to safety."  (emphasis in original)

**USAPA Intensifies Its Campaign, and Anonymous Communications — That Track USAPA's Campaign Slogans — Also Encourage the Illegal Slowdown**

53.     In approximately April 2011, USAPA started distributing yellow lanyards that pilots wear and use to carry their identification cards that state "Safety First" and "I'm on Board."  In response to an inquiry from West pilots regarding the "Safety First/I'm on Board" lanyards, USAPA's Communications Chairman stated that:  "The lanyards are not however just a 'party gift' handed to everyone; they are handed to those, from any domicile, who have first demonstrated that they are onboard with the idea that safety comes before everything else. . . there are pilots roaming the system giving them out to those who demonstrate they are on board.

If you're flying, demonstrate in some fashion that you're on board and have one of these pilots in the back, I would imagine you'll get one."

54.     Notably, the same "Safety First" and "I'm on Board" slogans on the USAPA-issued lanyards also appear in other anonymous communications calling for a concerted, illegal slowdown (in the form of recorded calls to pilots, personal calls to pilots, text messages, and e-mails).  For example, there were several calls made to pilots expressly encouraging them not to complete their "distance learning" by the FAA-imposed deadline of May 31, 2011.  Pursuant to FAA requirements, pilots at US Airways (and other commercial airlines) are required to complete certain online training programs, known as "distance learning," by set deadlines each quarter.  If a pilot does not complete the required training by the deadline, he or she will not be "legal" to fly until the training is completed.  Thus, if a pilot is scheduled to fly a flight but has not completed his or her required training, the Company will have to find a pilot who has completed the training to fly the trip.  If a significant number of pilots collectively waited until just before the deadline or until after the deadline to complete the training, US Airways' operations would be disrupted.

55.     Beginning in mid-April 2011, however, US Airways' pilots began receiving both live and pre-recorded phone calls instructing pilots to do just that.  Some callers read from a script, but all conveyed the message that the pilot should not finish his or her distance learning by the end of May 2011 to send a message to management.  At least one caller stated that he was given a list of phone numbers to call and was calling everyone on the "phone tree."

56.     In both the recorded calls and the live calls, the callers referenced "safety first," stated "I'm on board," and asked if the recipient of the call was "on board" — the same slogans

found on the lanyards distributed by USAPA and included in other official USAPA-communications.

57.     Anonymous pilots also have placed stickers in US Airways' pilot crew rooms and aircraft with the words "Distance Learning" with a circle around it and line through it — the well-known symbol for "No."

58.     In an effort to stop this aspect of the illegal slowdown, US Airways issued a written message to all pilots on May 19, 2011, stating that it was aware of the campaign to disrupt US Airways' operations by delaying completion of distance learning, and informing pilots that such an illegal job action would not be tolerated.

59.     In response, USAPA posted a short note on its website, "advis[ing] that it is not USAPA's policy to direct its members to collectively schedule their Distance Learning for the purpose of disrupting the Company's flight schedule."  USAPA, however, failed affirmatively to direct its pilots to complete distance learning as required by the RLA.

60.     USAPA's cursory posting was completely ineffective.  As of May 28, 2011 (three days before the FAA-imposed distance learning deadline), 897 pilots (896 of whom were East pilots) had not completed their distance learning.  Three days before the deadline is relevant because US Airways assigns pilots to "trips" that sometimes last four days — and a pilot that has not completed his training three days before the deadline could not be assigned to such a trip. Because the program is online, the Company was able to ascertain that 60% of these 897 pilots had completed 94% of the training module questions, suggesting that the pilots were simply waiting until the deadline or sometime thereafter to answer the last few questions.  As a result, and in order to ensure that there were enough pilots to fly scheduled flights, the Company requested and was granted an allowance from the FAA to extend the qualifications of those

pilots who had not completed the required training beyond the initial deadline of May 31. Absent this extension from the FAA, the Company would have had to cancel numerous flights.

61.     There also have been anonymous e-mails to pilots blatantly encouraging pilots to delay completion of their distance learning and engage in a variety of other job actions under the false pretense of safety — including the same safety issues and phrases that USAPA has addressed in its official communications.  For example, on April 25, 2011, an e-mail was sent to pilots with the subject line "I'M ONBOARD" from an e-mail address ("pilotsarepissedoff@gmail.com") not associated with an identifiable individual.  Among other things, the e-mail asked pilots, beginning on May 1, 2011, to engage in slow taxi, stay home if they are fatigued, and refuse aircraft with legal MELs with the express purpose of "prov[ing] that [the pilots] are willing to endure a summer of inconvenience in exchange for decent wages."

62.     The references in the e-mails to "Safety First" and "I'm On Board" match the lanyards with these same statements being distributed by USAPA.  Moreover, several of the proposed job actions in the anonymous e-mails match the formal publications being issued by USAPA, including the request that pilots write up all discrepancies when and where they occur, not accept aircraft with MELs, and call in fatigued.

63.     During this same time, decals were placed on aircraft and clipboards at US Airways with a frowning face, the words "HAD ENOUGH YET?!!," and "+16" or "Had enough of Parker?  Time to get serious about a contract BLOCK + 16."  The reference to Parker is to Doug Parker, US Airways' Chief Executive Officer, and "+16" is a reference to the fact that flights that arrive at least 15 minutes after their scheduled arrival time are considered late and count against an airline's on-time performance record under the DOT's standard.

64.     A USAPA publication entitled "The Iron Compass" issued on April 27, 2011, addresses this same issue under the heading "This Week's Safety First Review Items." The USAPA publication states: "The Department of Transportation counts a flight as on-time if it arrives less than 15 minutes after the scheduled time shown in the Computer Reservations System; therefore arrivals within 14 minutes (hence, A 14) are considered on-time." There is no reason for USAPA to include statements regarding the DOT's standards for an on-time flight as a safety issue — other than to send a message to pilots to arrive later than 14 minutes to disrupt US Airways' operations.

65.     During this same April/May 2011 time period, Safety Committee Chairman Kubik started providing advice to US Airways' pilots regarding aircraft operations in contradiction of the Company's Standard Operating Procedures ("SOPs"). The Company's SOPs have been developed as part of its safety program and have been approved by the FAA. In a March 31, 2011 communication entitled "What is Safety Culture and Why is it so important," Kubik stated that his "guidance [to US Airways' pilots] will, at times, differ, from SOPs." Since that time USAPA and Kubik have indeed issued several publications that contradict the Company's SOPs, including in regards to gate hold procedures and specific SOPs regarding single engine taxiing. Kubik's guidance to pilots has also mischaracterized how the Minimum Equipment List is to be applied and used by the Company and its pilots. As to this issue, Kubik's advice attempted to change the long-standing FAA-sanctioned process regarding the Minimum Equipment List that has been used for many years by all airlines operating under the FAA's oversight.

66.     As a result of Kubik's communications contradicting the Company's SOPs, on July 1, 2011, US Airways sent Kubik a letter advising him that he has no authority to advise

pilots to disregard the Company's SOPs or to create different operating procedures for its pilots. The letter also directed Kubik not to contradict the Company's SOPs, and explained that if USAPA or Kubik believes the Company's SOPs should be modified in any way, recommendations should be brought to the Company through USAPA's representation in US Airways' Safety Management System. Kubik responded in a letter dated July 27, 2011, claiming that he is "a safety guy, period" and does not "get involved in politics . . . [or] contract negotiations." As set forth herein, however, the evidence demonstrates otherwise.

67. On April 28, 2011, as a result of the general increase in communications encouraging the slowdown, US Airways sent a letter to USAPA demanding that it take immediate steps to stop this unlawful activity as required by the RLA. USAPA, however, simply continued on its course. Instead of taking steps to stop the slowdown, USAPA released another safety video on May 11, 2011. This time, the video addressed "Chief Pilots," stating that "[i]f the Captain is dissatisfied with any aspect of the aircraft's airworthiness and/or maintenance status, if he is not sure the operation can be safely executed, then the operation will stop until he is completely satisfied." The video emphasized that the purpose is to stop the operation: "Please make sure you understand this part. The operation will stop until he is completely satisfied. That satisfaction has nothing to do with the Chief Pilot. That decision is yours and yours alone."

68. In addition and despite the Company's letter, USAPA even began using its "Strike Prep Committee" to disseminate purported safety information. On May 3, 2011, USAPA's Strike Prep Committee released a publication linking USAPA's purported safety campaign to working conditions, stating in part that: "it is time for us to make a concise and powerful statement that we will no longer tolerate unfair working conditions at our airline. What should you do? There are many things that we must focus on as we move forward. First and

foremost is the safety culture. . . . We must MEET OR EXCEED the safety standards of the FOM [Flight Operations Manual] and FARs [Federal Aviation Regulations] in every single decision that we make. . . . A storm approaches, my friends."

69.     Around the same time, USAPA also issued a hard-copy publication, entitled "Safety Committee Operational Guidance," which was mailed to pilots' homes and tracked the videos described above regarding maintenance write-ups and otherwise slowing down the operation. And on May 9, 2011, in further attempt to obtain leverage, USAPA issued a press release, which called for the termination of US Airways' Vice President of Safety and Regulatory Compliance, Paul Morell, and attempted to garner media attention calling into question US Airways' operations.

70.     Then, on May 10, 2011, USAPA responded to the Company's April 28 letter demanding that it stop the unlawful actions. USAPA asserted that it did not endorse any concerted action in regards to pilots not completing distance learning, but that "[s]afety is another matter." Instead of addressing the Company's contention that USAPA is engaged in a slowdown campaign under the guise of safety, USAPA's letter defended its actions and instructions to pilots with respect to slowing down the operation.

71.     Next, on May 12, 2011, an e-mail was sent to US Airways' pilots from the e-mail address "thecaptain.safetyfirst@hotmail.com" containing a fake press release ("dated" June 26, 2011), which announces that US Airways has acquiesced to a new collective bargaining agreement as a result of pilots disrupting the operation and the traveling public choosing other airlines: "The announcement of an agreement seemingly came overnight . . . . [T]he frustration felt by the pilots over the slow pace of negotiations appears to have negatively affected the daily operations of the carrier to the point where passengers are 'booking away' from the airline

potentially costing the carrier hundreds of millions in future revenue. After a stellar performance in 2010 and again in the first half of 2011, when US Airways' led the industry in on-time and completion factor the carrier recently plummeted to dead-last in on-time, flight completions and customer complaints. . . . . (Does this intrigue you? Then forward it to your peers and get Onboard!)"

72. Indeed, despite US Airways' attempts to get USAPA to stop its campaign, USAPA has become even more brazen in its encouragement of pilots to cause delays. For example, on May 11, 2011, just as the summer heat was descending upon Charlotte and US Airways' east coast operations, USAPA issued a publication to pilots entitled "APU Usage and FOM Compliance." The publication encouraged pilots to delay flights if the aircraft cabin was not at a comfortable temperature: "If your passengers are boarded onto a hot aircraft prior to your arrival, it may be prudent to stop the boarding and have the flight attendants survey those already onboard the aircraft for signs of these symptoms. If they are observed, use your judgment as to the need to remove all passengers from the aircraft and have the paramedics called to evaluate the health of those that appear to be afflicted . . . If you are unable in spite of your best efforts to provide a comfortable aircraft for your passengers you may be left with no choice but to delay the flight until such time as another aircraft if available . . . ."

73. In the June 22, 2011 edition of "The Iron Compass," USAPA once again addressed "on-time pressures," much like it did in its March 23, 2011 video on the same topic. This time, USAPA expressly instructed pilots "to stop the operation" in response to such pressures.

74. Most recently, USAPA purchased a full page advertisement in the Money Section of *USA Today* entitled "US Airways' Unwritten Policy: Revenues First, Safety Second?," which

was published on July 22, 2011.  In the advertisement, USAPA alleged that, on June 16, 2011, certain US Airways pilots were pressured to ignore their safety concerns and fly a plane that needed maintenance.  Contrary to USAPA's assertions, the FAA issued a statement with respect to the incident stating that it "found no violation of Federal Aviation Regulations" and that "US Airways followed their approved MEL procedures, and all maintenance procedures were followed in accordance with the operator's approved maintenance program."  US Airways was also compelled to issue a statement in response setting forth the Company's position that "USAPA has embarked upon a smear campaign that in reality is all about contract negotiations, not safety" and is "the latest in a series of misguided efforts to put pressure on the Company as part of [contract] negotiations . . . us[ing] safety as a negotiating tactic."

75.    In addition to the recent increase in official USAPA publications, there has also been an increase in anonymous e-mails encouraging the slowdown.  On July 16, 2011, an e-mail was sent with the subject line "Meaning of being 'ON BOARD'" from the e-mail address "bus321pilot@gmail.com."  The e-mail stated that "[b]eing 'ON BOARD' means . . . do[ing] what you can to help our cause," including being "15 MINUTES LATE EVERYWHERE."  The e-mail also stated that pilots who do not take these actions should "GET OUT AND STOP BITCHING ABOUT A CONTRACT."

76.    The communications encouraging the slowdown are also now being sent to pilots by text message.  On approximately July 10, 2011, a note was found in the flight deck of a US Airways' aircraft stating that:  "ALL FUTURE MESSAGES AND ALERTS WILL BE COMMUNICATED VIA TEXT MESSAGE[.]  Please text your name and cell number to: 704-249-6660[.]  You will be added to the communication list[.]  Management is very upset about the

deteriorating performance of our airline. It's time to turn up the heat. WE WILL Prevail[.] Pass this along to another pilot that you know is "ON BOARD[.]"

77. And on July 22, 2011, an e-mail was sent from an e-mail address "angrypilots@gmail.com." The e-mail noted that a future "action" will take place, and that pilots who have joined the "text network" will receive a text message with the date of the "action" and that it would be "profoundly effective." Until that time, the e-mail asked pilots to harm the Company's on time performance numbers by "arriv[ing] at least 16 minutes late most of the time," writing up maintenance issues "no matter how small they must seem," and engaging in slow taxi, among other things. The e-mail also thanked pilots "for being on board" and encouraged the use of that phrase in official pilot communications.

78. Also on July 22, 2011, an e-mail was sent from the e-mail address "b767pilotdriver@gmail.com" directing pilots to "Remember to SLOW DOWN for safety!!!" After instructing pilots as to various actions they should take to disrupt operations, the e-mail concluded with: "We have them on the run. Time for the knock out punch."

**USAPA Intimidates Pilots Who Do Not Participate in Its Illegal Slowdown Campaign**

79. USAPA has intimidated pilots who refuse to acquiesce in the union's illegal activities. On June 23, 2011, USAPA's Charlotte domicile issued an update asking pilots to report their colleagues who accept flight assignments from the scheduling department referred to in the East pilot collective bargaining agreement as POTA (Priority of Trip Assignments). The publication instructs pilots not to answer calls from the scheduling department, and goes on to state that the names of pilots who accept POTA assignment will be published to the union membership and that such pilots will be nominated for "The Doug Parker Golden Bonus Award" — described by USAPA as an award "to be given in recognition of any pilot who goes above and beyond the call of duty to make sure Doug Parker and his management team continues to

'earn' their hefty bonuses." The update provided examples of certain pilots who were nominated, including a pilot who answered a call from the scheduling department and accepted a POTA assignment in order to prevent a flight cancellation (which USAPA sarcastically referred to as "valiant efforts").

80.     Then on July 24, 2011, an anonymous text message was sent to East pilots stating: "Seems like we have our first winner for the COMPANY SUCK UP AWARD… PINK PANTY AWARD or whatever you want to call it. This A330 CAP on Reserve, on July 15th had 1 Day Available, suddenly on July 16th he is on a FRA 3 day trip. Congratulations go to [rank and file US Airways pilot] TOM BELTZ as our first winner. Keep up the good work by screwing all your fellow pilots that are trying to get a contract we deserve. If you have a good reason please let everyone know." Around this same time, a card was placed in a pilot's mailbox stating: "CONGRATULATIONS! You're a WINNER! Your heroic effort to help management achieve their bonus checks has earned you the Pretty Pink Panties award[.] Do you want a new contract? EARN IT[.]"

81.     Other anonymous e-mails have also been distributed threatening pilots who do not participate in USAPA's campaign. For example, on July 16, 2011, an anonymous e-mail stated that it would publish the names of pilots who did not "drop trips" — a process by which pilots can reduce their schedule and which if done collectively can force the Company to cancel flights. And a July 22, 2011 anonymous e-mail instructing pilots to take steps to hurt the Company's on time performance measures expressly stated that "[p]eer pressure is an important aspect of [the] effort." The e-mail stated that the author "will make sure that all of our pilots know who is not strong enough to walk the walk. . . and this is no place for pansies," noting that while the on time performance of individual crews is being monitored, pilots can submit nominations for

"company pilot of the week" to "captainsonboard@aol.com." And another anonymous e-mail from July 22, 2011 (from the e-mail address "b767pilotdriver@gmail.com") stated that the sender of the e-mail had obtained a list of the names of pilots who accepted voluntary flying and stating that "We will be watching these same individuals . . . ."

**USAPA's Illegal Slowdown Has Irreparably Injured US Airways and the Traveling Public**

USAPA and the East Pilots' Actions Have Caused Operational Disruptions That Cannot Be Explained by Chance

82.    USAPA's directives to its membership have been effective, and these changes in the status quo cannot be explained by "chance." US Airways has an elaborate system for tracking and compiling detailed data regarding delayed departures, taxi times, maintenance write-ups, and a number of other variables that impact the operations of US Airways. This data demonstrates that the East pilots have been engaged in a concerted effort to alter the status quo and illegally slow down the operation, and the West pilots have not altered their behavior.

83.    In accordance with the May 1 start date set forth in certain of the e-mails encouraging the illegal slowdown, pilots began to disrupt the operation on May 1 by delaying departures, engaging in slow taxi, increasing the frequency of their maintenance write-ups, and calling in fatigued. The rate of delayed flights caused by pilots as tracked by the Company, which is historically just over 1.31%, began to rise sharply on May 1 and has averaged approximately 2.85% since that time.

84.    There also has been a dramatic increase in "taxi" times (the time it takes a pilot to taxi an aircraft to and from the gate). Historically, the average "taxi in" time (when a pilot taxis the aircraft to the gate after landing) for East pilots is 6.26 minutes. Since May 1, however, the average has increased by 0.63 minutes (after controlling for weather and other factors). And "taxi out" times (when a pilot taxis from the gate to the runway) have similarly increased.

Historically, the "taxi out" time for East pilots is 19.35 minutes, but since May 1, that has increased by 0.90 minutes (after controlling for weather and other factors). The chance of this being random is also less than 1%.

85.    A comparison of US Airways' East operations with its "Express" operations (those performed by US Airways' regional carrier partners whose pilots are represented by a different union and have not been part of USAPA's campaign) also demonstrates that the increase in taxi times is a result of concerted action. This comparison is important because US Airways' Express operations are subject to the same weather and any other airport specific issue that would impact taxi time performance, but the pilots for express operations are not members of USAPA. In general, Mainline taxi times tend to be longer than Express taxi times. Historically, the difference between East and Express "taxi in" times is 0.24 minutes, but this has increased to 1.14 minutes since May 1 — nearly four times the historical average. By way of example, the probability of the observed difference between East Mainline and Express taxi-in times for the week ending July 26, 2011 being random as opposed to the result of concerted activity is approximately one in 6,179. The gap between East and Express taxi out times has similarly widened from a historical average of approximately 2 minutes to nearly 3.5 minutes since May 1.

86.    The number of maintenance write-ups by East pilots also has increased dramatically. Pilots have authority and discretion to write-up any maintenance item. While there is no prohibition against pilots writing up any and all maintenance items, including very minor items (e.g., broken passenger light, a non-essential placard, or a host of other items), in normal circumstances, pilots exercise their authority and discretion to not write up deferrable minor items when it could produce a delay or cancellation of a flight. For the week ending July

26, 2011, the percentage of flights for which East pilots wrote up maintenance issues was over 33% compared to a historical average of approximately 24%. Based on a statistical analysis of US Airways' detailed historical data, the chance of this being random — as opposed to concerted activity — is approximately one in 800,000. Notably, the rate at which East pilots are increasing their use of maintenance write-ups is far greater at airports where US Airways does not have its own maintenance personnel — thus making such write-ups much more likely to result in a flight delay or cancellation.

87. Calls from pilots who are reporting that they are too fatigued to fly have also increased sharply. Historically, only 17.5% of all days have had an East pilot fatigue call, but that number has increased to 42% since May 1. Put another way, prior to May 2011, there were fewer than seven East pilot fatigue calls per month. In May and June of this year, however, there were 17 and 19 fatigue calls by East pilots, respectively. The probability that the level of fatigue calls observed in May and June is the result of random statistical variation is less than 0.26% and 0.03%, respectively.

88. All of the increases in operational metrics described above are considered "statistically significant." In other words, these increases were all well in excess of what conventional statistical analysis would consider to be "random" occurrences.

89. Equally important is that, during this same time period of May 1 to the present, these operational performance metrics for West pilots have remained consistent with historical averages.

USAPA and the East Pilots' Actions Directly Translate into Irreparable Harm in the Form of Lost Customer Goodwill and Damage to US Airways' Reputation

90. The East pilots' dramatic changes in behavior directly translate into irreparable harm in the form of a tarnished reputation in the marketplace and lost customer goodwill as well

as significant costs.  US Airways' rankings in on-time performance have dropped dramatically since May 1.  While US Airways has ranked either first or second among its peers in terms of on-time performance (as tracked by the DOT) in 2008, 2009, 2010, and in the first four months of 2011, it has ranked next to last since May of this year.  On a historical basis, the percentage of US Airways' flights (flown by East pilots) arriving on time (per the DOT's standard of within 14 minutes of the scheduled arrival time) has averaged 79%.  Since May 1, however, this figure has dropped by almost 11 percentage points (after controlling for weather and other factors).  And customers follow these rankings and make decisions based on them.  When an airline has strong operational performance, it attracts more customers, and an airline with weak operational performance attracts fewer customers.

91.     In addition, since May 1, it is estimated that East pilot actions have resulted in more than 1% of all East flights being cancelled.  This amounts to nine to ten cancellations per day since May 1, caused by the East pilots' actions.

92.     Since May 1, this illegal slowdown has disrupted the plans in the form of a late arriving flight, a cancelled flight, a missed connection by a passenger, or a failure of a passenger's bags to make the connecting flight (late arriving flights often result in passengers or bags missing connections) of many, many thousands of members of the traveling public. Cancelled flights alone have impacted an estimated 1,173 passengers a day — or 105,500 members of the traveling public since May 1.  And there has been an increase of more than five misconnected bags per thousand connecting passengers at Charlotte (the Company's largest connecting airport) since May 1 — which represents an increase of approximately 45% when compared to the historical average of 11.59 bags per thousand connecting passengers.

93.     Many of these customers who have been directly impacted will undoubtedly question whether to fly US Airways in the future.  Moreover, passengers who have bad experiences in the form of delayed or cancelled flights discuss these experiences with friends, family members, and colleagues, and often times broadly share their experience through social media channels, thus eroding goodwill of other customers or potential customers who were not directly impacted by the delay or cancelled flight.

94.     The pilots' concerted actions are also causing direct financial harm to the Company through increases in US Airways' costs and foregone revenue.  It is estimated that, should the current level of pilot job action persist, US Airways' damages from the illegal slowdown would be approximately $377,000 per day.  This represents approximately $348,000 per day in forgone passenger revenue from the erosion of passenger goodwill and the decline in relative service quality, more than $10,000 per day in costs associated with a passenger's bags missing a connection, and approximately $18,800 per day in added fuel consumption, wages, and engine maintenance costs from prolonged taxi times.  Notably, this estimate is conservative in that it does not include costs associated with passenger missed connections.

USAPA and the East Pilots' Actions Directly Translate into Irreparable Harm to the Traveling Public

95.     USAPA's and the East pilots' actions are also causing irreparable harm to the traveling public.  Each flight that is late or cancelled results in disruption to the passengers' daily lives, including adverse impact such as missing an important family or business event.  This harm to the traveling public is real and in many situations extremely disruptive.

<u>USAPA and the East Pilots' Actions Directly Translate into Harm to US Airways' Other</u>
<u>Employees</u>

96. USAPA's campaign is also directly harming US Airways' employees. As part of its efforts to improve and maintain operational reliability, US Airways established the "Triple Play Program," which provides monthly bonuses to more than 30,000 eligible employees (including 8,000 US Airways' employees based in Charlotte) if US Airways achieves a first place ranking in any of three DOT-measured metrics (on-time arrival, mishandled bags, and customer complaints) relative to its primary competitors. Under the program, employees receive $50 for each first place ranking in each metric for each month — or up to $150 per eligible employee per month. This program has resulted in significant payouts to US Airways' employees — earning employees approximately $24 million in 2010. This translates into $650 per employee in 2010. Thus, because USAPA's campaign is having a significant impact on US Airways' operational performance in terms of these rankings, USAPA is also causing direct financial harm to US Airways' employees.

**US Airways Has Attempted to Resolve This Dispute Without Judicial Intervention**

97. US Airways has made multiple attempts to get USAPA to stop its illegal conduct. Specifically, US Airways sent letters informing USAPA that its actions are a violation of the RLA and requesting that it take actions to stop the slowdown on December 23, 2010, February 11, 2011, April 28, 2011, and July 1, 2011. In response, USAPA denied that it was engaged in an illegal slowdown and, with the exception of a brief posting on its website regarding distance learning, has refused to take any action to stop the actions of the pilots. Rather, as explained above, the illegal slowdown has only intensified. The Company has also counseled, warned, and disciplined pilots engaging in slowdown tactics in an attempt to deter this activity.

## FIRST CAUSE OF ACTION - VIOLATION OF RAILWAY LABOR ACT

98. Plaintiff realleges and incorporates by reference the allegations set forth in Paragraphs 1-97, inclusive.

99. USAPA's attempt to put pressure on US Airways in ongoing contract negotiations by disrupting operations through the use of its safety campaign is a blatant violation of its status quo obligations under Section 2, First, of the RLA, as established by the applicable legal precedent. *See*, *e.g.*, *United Air Lines, Inc.*, 563 F.3d 257; *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300 (11th Cir. 2001); *United Air Lines, Inc.*, 243 F.3d 349. These cases all arise in the identical context as here — a union attempting to put pressure on an airline in order to gain leverage in contract negotiations by disrupting operations — and all expressly confirm that in this situation, an injunction must issue.

100. Until completion of the RLA negotiation/mediation process (which is ongoing), Section 2, First, imposes two obligations that are at issue here: (1) a union and its officers and members cannot instigate or encourage a slowdown (or any other change in the status quo); and (2) a union must make all reasonable efforts to prevent or stop a slowdown. This has been repeatedly confirmed by the lead cases in this area. *See*, *e.g.*, *United Air Lines, Inc.*, 563 F.3d 257; *Delta Air Lines, Inc.*, 238 F.3d 1300; *United Air Lines*, 243 F.3d 349. The Defendants are violating both of these obligations.

101. Any claim by USAPA that this is part of an actual safety campaign is not credible. First, in its safety publications, USAPA has not "stayed on message." Indeed, USAPA has repeatedly conveyed its safety directives in the middle of publications discussing USAPA's "battle" for a new contract. Second, USAPA's safety campaign arose in the middle of contract negotiations and coincides with the failure of the parties to reach an agreement after several

years of negotiations. As confirmed by the case law, these facts alone are more than sufficient to demonstrate that USAPA's "Safety First" campaign is simply a guise to encourage pilots to slowdown. *See United Air Lines*, 243 F.3d at 355-57. Here, however, the true purpose of USAPA's campaign is further confirmed by the fact that it has only manifested itself in the behavior of the East pilots, while the same operational metrics remain within normal ranges for West pilots. In this situation, any claim by USAPA that its campaign is about actual safety concerns, and not a concerted, illegal slowdown, must be rejected.

102. Section 2, First, of the RLA, 45 U.S.C. § 152, First, imposes an affirmative legal duty on employers, unions, and employees "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . . in order to avoid any interruption to commerce." This provision prohibits either party from altering the status quo or otherwise attempting to employ economic self-help from the moment a union is certified until the parties have exhausted the elaborate negotiation and mediation mechanisms provided for under the RLA. *See Consol. Rail Corp.,* 491 U.S. at 302-03; *see also Bhd. of Ry. & S.S. Clerks v. Fla. E. Coast Ry. Co.*, 384 U.S. 238, 244 (1966).

103. The obligation under Section 2, First, to refrain from engaging in slowdown activities is "a substantive legal duty 'enforceable by whatever appropriate means might be developed on a case-by-case basis.' An injunction is an appropriate remedy to compel the performance of this legal duty." *Delta Air Lines*, 238 F.3d at 1308-09 (quoting *Chi. & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 577 (1971)). Accordingly, federal courts are authorized under Section 2, First, "to enjoin not only strikes but also 'union conduct . . . which has the consequences of a strike,' such as refusal of overtime, slowdowns, and sit-ins." *See United Air Lines*, 243 F.3d at 362 (citing *Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.*, 802

F.2d 886, 906 (7th Cir. 1986)); *Elevator Mfrs.' Ass'n v. Local 1, Int'l Union of Elevator Constructors*, 689 F.2d 382, 386 (2d Cir. 1982). In addition to enjoining such status quo violations, courts may enjoin imminent threats of such violations. *See*, *e.g.*, *Norfolk & W. Ry. Co. v. Bhd. of R.R. Signalmen*, 164 F.3d 847, 856 (4th Cir. 1998).

104. US Airways and USAPA currently are parties to collective bargaining agreements that remain in full force. The parties therefore have not exhausted the procedures required by the RLA. Accordingly, the concerted campaign by US Airways pilots, at the direction of USAPA and Cleary to slow down in their duties violates Section 2, First, of the RLA.

## PROPRIETY OF INJUNCTIVE RELIEF

105. No showing of irreparable injury is required to obtain an injunction against an unlawful violation of the status quo obligations under the RLA. In *Consolidated Rail*, the Supreme Court held that "[t]he district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, *without the customary showing of irreparable injury*." 491 U.S. at 303 (emphasis added); *see also United Air Lines*, 243 F.3d at 362-64 (directing the district court to issue a preliminary injunction without any consideration of whether United had shown irreparable injury and rejecting the IAM's argument that the district court properly denied an injunction on the grounds that United could deal with the job action by disciplining the individuals involved). Thus, upon a showing that a union or its members have altered the status quo, a preliminary injunction should issue as a matter of course. USAPA's express directives to the pilots to alter the status quo justify such relief without further analysis.

106. Even if irreparable injury to the Company were required, US Airways has suffered and will continue to suffer irreparable injury as a result of Defendants' unlawful job

actions. As a direct result of Defendants' illegal slowdown, US Airways has suffered irreparable harm in the form of lost customer goodwill and a tarnished reputation in the marketplace.

107. US Airways has no adequate remedy other than injunctive relief because of the irreparable harm it is suffering as a result of the illegal actions of Defendants, and will continue to suffer irreparable harm without injunctive relief.

108. The traveling public is also suffering irreparable harm as a result of the illegal actions of Defendants, and will continue to suffer irreparable harm without injunctive relief. The public interest alone warrants an injunction.

109. The Defendants are engaged in an ongoing concerted effort to delay and interfere with US Airways' operation. A preliminary injunction is therefore necessary in order to prevent this disruption to US Airways' operations and the resultant damage to US Airways' goodwill, brand, reputation, and relationship with its passengers. Absent a preliminary injunction, Defendants and USAPA's members will be free to continue to disrupt US Airways' operations.

110. As to each item of relief sought, greater injury will be inflicted on the public and upon US Airways if such relief is denied than will be inflicted upon Defendants by the granting of the relief sought.

WHEREFORE, Plaintiff prays for relief as follows:

1. That this Court issue a Preliminary Injunction and a Permanent Injunction, restraining and enjoining Defendants USAPA and Cleary and USAPA's members, agents, and employees, and all persons and organizations acting by, in concert with, through, or under it, or by and through its orders, pending a hearing on the permanent injunction in this matter, from calling, permitting, instigating, authorizing, encouraging, participating in, approving, or continuing any interference with Plaintiff's airline operations, including, but not limited to, any

slowdown, strike, work stoppage, sick-out, work to rule campaign, concerted refusal to accept voluntary or overtime flying, or other concerted refusal to perform normal pilot operations in violation of the RLA, 45 U.S.C. § 151 *et seq*.

        2.      That this Court further order that the Defendants take all reasonable steps within their power to prevent the aforesaid actions and to refrain from continuing the aforesaid actions if commenced, including, but not limited to, the following:

        a.      Instructing all pilots represented by Defendant USAPA and employed by Plaintiff to resume their normal working schedule and practices and providing Plaintiff a copy of all such instructions;

        b.      Notifying all pilots represented by Defendant USAPA and employed by Plaintiff, by the most expeditious means possible, of the issuance, contents, and meaning of this Preliminary Injunction and providing Plaintiff a copy of all such notices;

        c.      Including in such notice a directive from USAPA to US Airways' pilots not to engage in a concerted refusal to perform normal pilot operations, including but not limited to, slow taxiing, writing up maintenance items, calling in fatigued, delaying flights, refusing to answer a call from the scheduling, refusing to fly an aircraft that meets legal requirements for flight, or refusing to accept voluntary or overtime flying, and to cease and desist all such activity and to cease and desist all exhortations or communications encouraging same, upon pain of fine, suspension, or other sanction by USAPA;

d.      Posting the notice described above on Defendant USAPA's internet websites and providing Plaintiff a copy of the notices;

e.      Including the contents of such notice on all recorded telephone hotlines under control of Defendants, until such time as the Court has acted on Plaintiff's Motion for a Permanent Injunction, and providing Plaintiff a copy of all such messages; and

f.      Distributing the contents of such notice through all non-public communication systems maintained by Defendants, including any telephone trees, text message lists, pilot-to-pilot communication systems, or similar systems, and providing Plaintiff a copy of the notices.

3.      That this Court further order that the Defendants are prohibited from including in such notices (or distributing contemporaneously with such notices) any statements that are intended or could reasonably be interpreted to mean that pilots should continue to engage in the previously-described conduct notwithstanding the Preliminary Injunction including:

a.      Any assertion that the Preliminary Injunction does not prohibit individual pilots from making voluntary decisions to engage in such actions; and

b.      Any explanation of circumstances in which it would be appropriate or necessary for pilots to engage in such actions prohibited by the Preliminary Injunction.

4.      That this Court further order that Defendants report to the Court by 5 p.m. on the day immediately following issuance of the Preliminary Injunction, by sworn affidavit, the methods used to effect the notice described above to all USAPA-represented pilots, and furnish

to the Court copies of all notices required to be furnished to the Plaintiff by Defendant and under the Court's Order; and

5. Such other and further relief as the Court deems proper.

This the 29th of July, 2011.

Respectfully submitted,

/s/ Robert R. Marcus
Robert R. Marcus
N.C. State Bar No. 20041
Jonathan P. Heyl
N.C. State Bar No. 25559
C. Bailey King, Jr.
N.C. State Bar No. 34043
SMITH MOORE LEATHERWOOD LLP
525 N. Tryon Street, Suite 1400
Charlotte, North Carolina 28202
Telephone: (704) 384-2630
Facsimile: (704) 384-2800
E-mail: rob.marcus@smithmoorelaw.com
        jon.heyl@smithmoorelaw.com
        bailey.king@smithmoorelaw.com


O'MELVENY & MYERS LLP:

Robert A. Siegel
Michael G. McGuinness
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
E-mail: rsiegel@omm.com
        mmcguinness@omm.com

Mark W. Robertson
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
E-mail: mrobertson@omm.com

*Attorneys for Plaintiff*