## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:11-cv-371–RJC–DCK

US AIRWAYS, INC.,      )
                   )
        Plaintiff,     )
                   )    **MEMORANDUM OPINION**
v.                )        **AND ORDER**
                   )
US AIRLINE PILOTS ASSOCIATION  )
and MICHAEL J. CLEARY,    )
                   )
        Defendants.    )
                   )
                   )

## I.      BACKGROUND

On July 29, 2011, Plaintiff US Airways, Inc. (US Airways) filed a Complaint for Injunctive Relief (Doc. No. 1) and Motion for Preliminary Injunction (Doc. No. 10) against Defendants US Airline Pilots Association (USAPA) and the president of USAPA, Michael Cleary (Cleary or Captain Cleary). Plaintiff alleges that the defendants have engaged in a campaign "to cause nationwide flight delays and cancellations in order to put pressure on US Airways in its current collective bargaining negotiations" with USAPA in violation of the "status quo" provisions of the Railway Labor Act (RLA). See (Doc. No. 1 at ¶1, citing 45U.S.C. § 152, First). On August 8, 2011, Plaintiff moved for a Temporary Restraining Order (TRO) (Doc. No. 29), and this Court held a TRO hearing on August 12, 2011. The day before the TRO hearing, the defendants filed a motion to dismiss, transfer, or stay the case (Doc. No. 34), which this Court denied on August 17, 2011 (Doc. No. 51). After hearing oral argument, this Court stayed a ruling on the TRO motion and set the matter for a preliminary injunction hearing (Doc. No. 42 at 38).

The parties presented evidence and testimony on the instant motion for preliminary injunction during an in-court hearing on August 19, 2011.[1]  Having considered the evidence received and the arguments of the parties, this Court **GRANTS** the Plaintiff's Motion for Preliminary Injunction against USAPA.  The Court enters the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## II.    FINDINGS OF FACT

### A.    Overview

US Airways claims that beginning on May 1, 2011, USAPA has instigated a work slowdown under the guise of a "safety campaign" in order to put pressure on US Airways in the ongoing contract negotiations.  The elements of this slowdown include encouraging pilots to delay flight departures, delay completing certain training requirements, decline to fly on the basis of fatigue, and increase maintenance write-ups.  US Airways also alleges that USAPA has threatened to expose and retaliate against those pilots who do not participate in the slowdown.  USAPA insists that its safety campaign is designed to address a flawed safety culture at US Airways and not to gain leverage in the ongoing contract negotiations.

### B.    The Parties

US Airways is a commercial air carrier, with domestic and international operations, that is subject to the RLA.  The airways is headquartered in Tempe, Arizona, while its largest operation is at the Charlotte hub.  It employs approximately 32,000 people, 5,200 of whom are pilots.  In May 2005, America West Holdings Corp. (America West) and US Airways announced

---

[1] Both sides agreed to follow the procedure outlined in <u>Delta Air Lines, Inc. v. Air Line Pilots Ass'n Int'l</u>, 238 F.3d 1300 (11th Cir. 2001) and submit a substantial portion of evidence through written declaration, while making those witnesses available for cross examination.

2

that they would merge into one entity, known as US Airways, effective September 27, 2005. Under the Merger Agreement, US Airways Group, Inc., which was then operating under Chapter 11 bankruptcy protection, would be reorganized, and the reorganized entity, known as "US Airways," would own and control the former America West and US Airways.

USAPA is the certified collective bargaining representative for pilots employed by US Airways. The association represents the 5,200 pilots and has four national officers: a President, Vice-President, Executive Vice-President, and Secretary-Treasurer. USAPA also has an 11-person Board of Pilot Representatives and maintains approximately 20 standing committees, including the Safety Committee, Accident Investigation Committee, and the Strike Preparedness Committee. Captain Cleary became president of USAPA on April 18, 2009 in the association's first national election of officers.

USAPA communicates with its members in many ways, including via email, videos, meetings, and through its robust website. Many of the USAPA communications received in evidence during the preliminary injunction hearing were bulletins and "Updates" sent to pilots by email, which were also posted on USAPA's website. Additionally, USAPA communicates with its members through channels that are only available to union members, such as the "Members Only" area of its website.

C. **Background to Current Labor Dispute**

Both sides presented evidence regarding the history of the current labor dispute, which has involved a merger as well as legal actions in Arizona and New York.

1) **Merger Between US Airways and America West**

When US Airways and America West Holdings Corp. merged, the "East pilots," employed by pre-merger US Airways, the "West pilots," employed by pre-merger America

3

West, and the merging companies agreed to a collectively-bargained multilateral agreement. This agreement supplemented and amended the collective-bargaining agreement (CBA) that existed at the time of the merger.

An integrated seniority list had to be created, and a dispute arose between the East and West pilots as to their relative placement on this list. Pursuant to the Merger Policy of the union that preceded USAPA, the Air Line Pilots Association (ALPA), the dispute was submitted to "final and binding" arbitration. The arbitration panel, chaired by George Nicolau, issued its award (the Nicolau Award) in May 2007. A majority of East pilots opposed implementation of the Nicolau Award. The East pilots outnumbered the West pilots (about 5,100 to 1,900), so they successfully decertified ALPA and replaced it with USAPA. Unlike ALPA, which was committed to pursuing the Nicolau Award, USAPA was committed to maintaining the principles of seniority based on date-of-hire for which the East pilots had advocated. USAPA was successfully certified as the collective bargaining representative for both East and West pilots on April 18, 2008.

West pilots brought an action against USAPA in the Arizona district court, and a jury found that USAPA had violated its duty of fair representation by abandoning the Nicolau Award in favor of a date-of-hire list solely to benefit the East Pilots at the expense of the West pilots. After a bench trial on remedy, the district court ordered USAPA to, *inter alia*, make all reasonable efforts to negotiate and implement a CBA with US Airways that implemented the Nicolau award. Addington v. U.S. Airlines Pilots Ass'n, 2009 WL 2169164, 18 (D. Ariz. July 17, 2009). However, the Ninth Circuit Court of Appeals held, as a matter of first impression, that the action was not ripe and remanded the case. Addington v. US Airline Pilots Ass'n, 606 F.3d 1174, 1179-80 (9th Cir. 2010). The question of the seniority lists and the West pilots' duty

4

of fair representation claim against USAPA is still pending.[2]

### 2) New York Action

On May 27, 2011, USAPA commenced an action in the Eastern District of New York seeking declaratory and injunctive relief against US Airways. USAPA's Amended Complaint in that case alleges five causes of action against US Airways, all arising from conduct that US Airways has allegedly taken against USAPA in violation of the RLA. On August 17, 2011, this Court denied USAPA's motion to dismiss, stay, or transfer the instant matter based on the pending action in New York. (Doc. No. 51). The New York district court has since granted US Airways's request for leave to file a motion to dismiss USAPA's Amended Complaint. US Airways's opening brief is due September 30, 2011.

### 3) Contract Negotiations

US Airways began negotiating with ALPA for a single CBA in November 2005. Those negotiations were not successful, in part because the East pilots halted negotiations by withdrawing their representatives on August 15, 2007 after issuance of the Nicolau Award. Soon after USAPA's certification, US Airways and USAPA began meeting regarding a single CBA in June 2008. Since January 2010, these negotiations have been mediated by the National Mediation Board (NMB). The NMB has authority to determine the pace of negotiations, including where and how often negotiations occur. The NMB has the unfettered authority to

---

[2] In July 2010, US Airways filed a declaratory judgment action against USAPA and the class of West pilots seeking a judicial determination of the parties' rights and obligations. US Airways, Inc. v. Addington, No. 2:10-cv-01570-ROS (D.Ariz., 2010). USAPA moved to dismiss on ripeness grounds. In June 2011, the court denied that motion, finding that the case was ripe because absent judicial relief, US Airways would be subject to a real threat of litigation by the West pilots, or a real threat of a strike following completion of the RLA negotiation process by the East pilots. Id.

release the parties from negotiations if and when it determines that agreement cannot be reached, and, only following such a release (and a 30-day "cooling off" period), would USAPA be permitted to engage in a work stoppage. In short, it has been almost six years since US Airways and America West merged, and it seems the parties have never been further from reaching an agreement.

### D.  USAPA Links Safety to Contract Negotiations

USAPA has expressly tied the success of their "fight" for a new contract to actions by their member pilots that would slow down the airline but could be cloaked by the safety campaign. See, e.g., Pl's Ex. 3 at 5: Charlotte Domicile Update.[3] The campaign became USAPA's primary focus in the fall of 2010, but USAPA laid the groundwork for a slowdown much earlier, through various communications.[4] For example, USAPA's Charlotte Domicile issued an Update on April 12, 2009 that included information about the status of contract negotiations and stated that pilots must "demand an industry standard contract. That takes work from all of us; stay informed, and continue the campaign of remaining Good Union Pilots." Pl's Ex. 2 at 3. The very next paragraph requested that pilots become better aware and informed of company policies, namely that pilots have "the latitude to stop the operation if in their mind safety standards are compromised." Id.

---

[3] There is some overlap between Plaintiff's Exhibits and Defendant's Exhibits. Where duplicative, this Court will generally cite to Plaintiff's Exhibits for consistency and ease of reference.

[4] USAPA unconvincingly argues that communications before May 1, 2011 should not be considered because US Airways offers no empirical data demonstrating an operational slowdown prior to this date. This evidence is relevant in linking safety to the labor action; the mere fact that these communications did not immediately result in a slowdown does not mean that they did not contribute to it.

6

Similarly, USAPA's Charlotte Domicile issued a December 18, 2009 publication just before the East pilots' labor contract became amendable on December 31, 2009. Responding to the continuing "onslaught of contractual grabs by management," USAPA instructed pilots to "Fly Safe" and prove that management is wrong to believe that "stealing from employee contracts can have no adverse affects to the bottom line." Pl's Ex. 3 at 4-5. And in February 2010, USAPA reminded pilots that "the operation will stop until [the Captain] is completely satisfied" as to safety issues. Pl's Ex. 4 at 2: USAPA Update. The publication concluded with the following admonition: "Please remember we have 224 pilots on furlough. Fly safely, Act Your Wage and be a Good Union Pilot." Id. This Court notes that flying safely has no relationship to contractual grabs or pilots on furlough.

On September 30, 2010, a USAPA bulletin expressly revealed that USAPA's safety campaign included improper motivations. The bulletin informed pilots that it would soon be circulating a survey and stated:

> USAPA's upcoming Safety Culture Survey is a groundbreaking opportunity for our pilots to provide input to the Safety Committee. We anticipate this survey will have *strong implications beyond just safety*, and we urge you to participate since the data will strengthen USAPA's ability to represent you, the line pilot.

Pl's Ex. 10 (emphasis added).

Finally, in perhaps the most damaging of all of USAPA's statements, the Strike Prep Committee released a publication when the slowdown began that clearly connected the safety campaign to working conditions. The May 3, 2011 Update stated:

> Friends, it is time for us to make a concise and powerful statement that we will no longer tolerate unfair working conditions at our airline. What should you do? There are many things that we must focus on as we move forward. First and foremost is the safety culture. With our pilots experiencing extreme levels of stress, we must make every effort to keep ourselves out of the red. . . . We must MEET OR EXCEED the safety standards of the [Flight Operations Manual] and [Federal Aviation Regulations] in every single

7

decision that we make. . . . A storm approaches, my friends.

Pl's Ex. 11. There is no conceivable reason for the Strike Prep Committee to discuss the safety culture in this context unless it were related to the stormy contract negotiations.

### 1. USAPA Links Safety Culture Survey to Contract Negotiations

In October-November 2010, USAPA commissioned the aforementioned Safety Culture Survey. The survey was conducted by the third-party Illumia Corporation at the direction of aviation safety expert Dr. Terry von Thaden. It characterized "safety culture" as "the enduring value and priority placed on worker and public safety by everyone in every group at every level of an organization." (Doc. No. 62 at 14: Exhibits to Affidavit of Thomas Kubik). The survey asked respondents – 86% of whom were East pilots – to rate a series of statements about safety culture on a seven-point scale. The Chair of USAPA's Safety Committee, Captain Thomas Kubik, asked US Airways to cooperate in the survey, but the company declined, despite the fact that America West had previously used Dr. von Thaden to do a similar survey, and US Airways's own safety publication had cited her studies with approval. Captain Lyle Hogg, Vice President of Flight Operations at US Airways, credibly testified that the reason the company did not take part in the survey was that it had recently conducted its own internal audit in which the pilots' responses were "less than professional, and in some cases they were profane," such that the audit itself was compromised. Evid. Hearing Tr. Trans. I at 88. "So with that in our recent history," Hogg went on, "when it came time to partner with the Union, or at least we were requested to partner with the Union on a subsequent audit, and not having a good experience in the previous audit, we declined to participate." Id. at 88-89.

Dr. von Thaden concluded that "the safety culture at US Airways is generally negative and in need of intervention." (Doc. No. 63 at 6: Report on Results from the Safety Culture

Indicator Scale Measurement System). In response to the survey, USAPA's Charlotte Domicile issued an Update on March 1, 2011 discussing the survey results and the company's reaction. One section consisted of notes taken by Vice-Chair of the domicile while Safety Committee Chairmen Kubik was speaking about the Safety Culture Survey. These notes stated, "this report gives us carte blanche authority to take back our airline." Pl's Ex. 41 at 10. Then, after criticizing Washington, D.C.-based pilots for their low participation in the survey, Kubik is reported to have said, "Peer pressure is very important, our profession is under attack. Speak up to your fellow pilots and let them know they need to be good union pilots." Id. Although Kubik testified that he was misquoted, no retraction or correction was ever printed, and so the Court finds that USAPA tacitly endorsed the error. The Update also encouraged pilots to "Fly Safe" and "if rushed ...... slow it down!" in the middle of a discussion of what it will take for pilots to win their "battle" for a new contract. Id. at 14. It closed by saying, "We must all focus on meeting or exceeding all US Airways Safety Standards. It is time for all US Airways Pilots to engage in the fight of our careers. United we stand, divided we fall." Id. at 14. These statements, among others, show that USAPA's safety campaign is at least partially designed to gain leverage over US Airways. Telling union members to "take back" their airline has more to do with contract negotiations than with safety, and there is no plausible safety-related reason for exacting peer pressure on fellow pilots to be "good union pilots."

2. **USAPA Releases Instructional Videos Discussing "Safety" Issues**

Captain Kubik testified that the Safety Committee unanimously decided to produce a series of videos to address the lowest scoring items from the survey after it became apparent that US Airways would not participate in the survey, accept the results of the survey, or suggest any other measures on safety culture. See Evid. Hearing Tr. II at 253. Likewise, Captain Cleary

9

testified that the pilots' current relationship with US Airways management in relation to safety stood in "stark contrast" to the "collegial, harmonious, and productive" relationship that existed before the merger. Evid. Hearing Tr. II at 355. However, this assertion was undermined on cross examination when Cleary could not actually identify any pre-merger management officials with whom the union had such positive interactions, except for conceding that Captain Hogg was Vice President of Flight Operations at US Airways in the pre-merger positive culture and continues in that position today. For its part, US Airways disagreed with the methodology and results of the survey. It told USAPA that pilots' legitimate safety concerns can and should be reported to the company through existing reporting systems. See Pl's Ex. 67: Letter from US Airways to the USAPA Safety Committee re: Survey. The Safety Committee proceeded to release six instructional videos on ostensibly safety-related issues, from March to May, 2011, some of which will be discussed below as they relate to the elements of USAPA's intertwined safety/slowdown campaigns.

### 3. "Safety First" and "I'm on Board" Messages

Around April 2011, USAPA started distributing yellow lanyards for pilots to wear and use to carry their identification cards that stated "Safety First" and "I'm on Board." Pl's Ex. 30 at ¶ 30: Hogg Decl. In response to an inquiry from West pilots regarding the lanyards, USAPA's Communications Chairman stated:

> The lanyards are not however just a "party gift" handed to everyone; they are handed to those, from any domicile, who have first demonstrated that they are onboard with the idea that safety comes before everything else . . . there are pilots roaming the system giving them out to those who demonstrate they are on board. If you're flying, demonstrate in some fashion that you're on board and have one of these pilots in the back, I would imagine you'll get one.

Pl's Ex. 42. Another USAPA publication to members defined being "On Board" as "a

10

commitment to your profession to never let your guard down."  Pl's Ex. 13: June 23, 2011

Charlotte Domicile Update.  Although the term "Safety First" has been used by US Airways in

the past, it is clear that USAPA now uses the phrase, and the lanyards, "as a symbol of our

solidarity" against management, and not as a guileless embrace of the Company's message.  See

Pl's Ex. 64: PHL Domicile Update.

The same "Safety First" and "I'm on Board" slogans also appeared in anonymous phone

calls, text messages, emails, and placards to pilots calling for a concerted slowdown.  See, e.g.,

Pl's Ex. 82: Transcript of recorded call; Pl's Ex. 16: July 16, 2011 email; Pl's Ex 52: Note re:

text messages; Pl's Ex. 57: Placard.  For example, one anonymous email to pilots, stated:

> Ok, what is the meaning of being "ON BOARD?"  I have heard from many that some of
> you are just wearing the lanyard.  Being "ON BOARD" means just that.  You do what
> you can to help our cause . . . YOU ARE 15 MINUTES LATE EVERYWHERE .... GOT
> IT ... or ... GET OUT AND STOP BITCHING ABOUT A CONTRACT.

Pl's Ex. 16.

Moreover, several of the anonymous communications blatantly encourage pilots to

engage in a variety of other actions under the facade of safety – delaying completion of their

distance learning, writing up all discrepancies when and where they occur, rejecting aircraft with

"MEL" issues, and calling in fatigued – mimicking safety issues and phrases that USAPA used in

its official communications.  See, e.g., Pl's Ex. 43; Pl's Ex. 53; Pl's Ex 54.  The first of these

communications was a call to action to "every East pilot" from "pilotsarepissedoff@gmail.com"

which stated, "This is The Captain with the second SAFETYFIRSTupdate . . . I'm onboard and

we need you onboard.  May 1st has been selected as the impiementation [sic] date for the next

portion of our Safety First program."  Pl's Ex. 53: April 25, 2011 anonymous email (emphasis

added).  The email went on to ask the East pilots for their "support and compliance" with a

11

number of "Safety Initiatives" including that they taxi "NO faster than a brisk walk," write up all

discrepancies, and stay home when tired or stressed.  Id.

Another anonymous email sent to pilots from "thecaptain.safetyfirst@hotmail.com" on

May 12, 2011 contained a fake press release ("dated" June 26, 2011), announcing that US

Airways had succumbed to a new collective bargaining agreement as a result of pilots harming

daily operations such that passengers chose other airlines:

> The announcement of an agreement seemingly came overnight . . . . In recent weeks, the frustration felt by the pilots over the slow pace of negotiations appears to have negatively affected the daily operations of the carrier to the point where passengers are "booking away" from the airline potentially costing the carrier hundreds of millions in future revenue. After a stellar performance in 2010 and again in the first half of 2011, when US Airways' led the industry in on-time and completion factor the carrier recently plummeted to dead-last in on-time, flight completions and customer complaints . . . (Does this intrigue you? Then forward it to your peers and get Onboard!)

Pl's Ex. 48.

US Airways also presented evidence that pilots are now encouraging the slowdown by

text message.  Captain Hogg declared that he obtained a note, on approximately July 10, 2011,

which was found in the flight deck of a US Airways aircraft, stating that:

> ALL FUTURE MESSAGES AND ALERTS WILL BE COMMUNICATED VIA TEXT MESSAGE
> Please text your name and cell number to: 704-249-6660
> You will be added to the communication list
> Management is very upset about the deteriorating performance of our airline. It's time to turn up the heat. WE WILL PREVAIL
> Pass this along to another pilot that you know is "ON BOARD"

Pl's Ex. 52.  A July 22, 2011, e-mail from "angrypilots@gmail.com" stated that a future "action"

will take place, and that pilots who have joined the "text network" will receive a text message

with the date of the "action," which should be "profoundly effective."  Pl's Ex 54.  Until that

time, the e-mail advised pilots to "arrive at least 16 minutes late most of the time," write up

maintenance issues "no matter how small they may seem," and engage in slow taxi, among other things.  Id.  The e-mail also thanked pilots "for being on board" and encouraged the use of that phrase in official pilot communications.  Id.  The same day, another anonymous email from "b767pilotdriver@gmail.com" reminded pilots to "SLOW DOWN for safety!!! . . . No need to be in a big hurry for nothing.  There is always another commute [sic] flight."  Pl's Ex. 54.  It also told pilots to "stop busting your ass for Parker... BE SAFE in today's environment" and to "[k]eep wearing your 'On Board' lanyards," and if confronted about wearing them, "then go through the questions to ask that USAPA sent out."  Id.  The email concluded with: "We have them on the run. Time for the knock out punch."  Finally, US Airways submitted bag tags that brazenly mix the safety message with the contract message.  One side reads "I AM **ON BOARD** SAFETY FIRST!" the other says "I'VE HAD ENOUGH I AM READY TO **STRIKE**".  Pl's Ex. 88.  Captain Hogg testified that he received a box containing the bag tags in the mail on August 18, 2011; moreover, evidence from the U.S. Postal Service indicated that the box had been mailed from USAPA's headquarters in Charlotte.  Hearing Tr. I at 96.

### E.  Elements of USAPA's Slowdown

USAPA's "safety" campaign has instigated a slowdown among East pilots that has negatively impacted the Company's operational performance.  The slowdown tactics include dramatic increases in pilot maintenance write-ups, pilot fatigue calls, taxi times, and pilot-induced departure delays.  USAPA has also discouraged both voluntary flying and the completion of mandatory training.  As a result of these tactics, there has been a significant decline in US Airways's on-time performance that has harmed the company's bottom line and its reputation.

1.      **Maintenance Write-ups**

All aircraft contain a log of minor equipment issues that generally do not affect the

aircraft's airworthiness, known as a "minimum equipment list" (MEL).  Ex. 30 at ¶ 7: Hogg

Decl.  Under Federal Aviation Administration (FAA) regulations, an airline is entitled to defer

maintenance on these items, which allows the airline to keep operating on schedule until the

aircraft reaches a station with a full maintenance operation or can be fixed overnight.  See id.;

Evid. Hearing Tr. II at 261.  US Airways pilots have authority and discretion to refuse to fly an

aircraft with MEL issues, even if no repairs are legally required, because this may be prudent in

some circumstances.  While there is no prohibition against writing up any and all maintenance

items, including very minor items (e.g., broken passenger light, a non-essential placard), pilots

ordinarily exercise their authority and discretion to not write up deferrable minor items when it

could produce a delay or cancellation of a flight.  Pl's Ex. 30 at ¶ 7: Hogg Decl.  In a slowdown,

discretion can be exercised as a pretext for creating flight delays and cancellations when pilots

reject aircraft even though they have no genuine safety concerns.

On April 4, 2011, USAPA's Safety Committee released a video encouraging pilots

to change their normal behavior and not accept aircraft with MELs when they "innately know"

that they should not.  Pl's Ex. 80 at 2: MEL video trans.  The video stated, in part:

> Use your experience and judgment when confronted with an MEL.  Do not accept one
> that puts you and your crew into the yellow and compromises safety.  Take all factors
> into consideration and never be intimidated by anyone whether from dispatch,
> maintenance, or the Chief Pilots' office.  Our safety culture is flawed, and we must put a
> stop to it.  *We* make the final call on the MEL items we accept.

Id.  When Captain Kubik was asked on cross examination whether he understood that instructing

pilots "to change their behavior regarding non-deferred MEL maintenance . . . might have a

potential impact on company operations," he responded that he "never gave that much thought."

14

Evid. Hearing Tr. II at 68.  Kubik's response is not credible in light of the Company's recent battle with USAPA's Safety Committee, during which the Company accused USAPA of doing something remarkably similar: instructing pilots to change their behavior and refuse to fly airplanes with missing "inspection hole" covers in order to disrupt operations.  See Pl's Ex 9: US Airways Letter Re: Unlawful Job Action.   This Court finds that USAPA's statements about MEL maintenance went beyond merely reminding pilots to use good judgment and instead encouraged them to collectively reject aircraft with MELs  in order to disturb operations.

The pilots heeded USAPA.  US Airways's statistical expert, Dr. Darrin Lee, provided reliable evidence[5] that the seven-day moving average of maintenance write-ups by East pilots began rising sharply starting in May 2011.[6]  For the week ending July 26, 2011, the percentage of flights for which East pilots wrote up maintenance issues was 33.48%, compared to a historical average of approximately 23.56%.  Pl's Ex. 84 at  ¶ 10.  Based on a statistical analysis of US Airways's detailed historical data, the chance of this being random – as opposed to concerted activity –  is roughly one-in-800,000.  Id. at ¶ 14.  Moreover, the elevated level of pilot write-ups has persisted continuously since May 1st.  Id.  Notably, the rate at which East pilots are increasing their use of maintenance write-ups is far greater at airports where US Airways

---

[5] Dr. Lee used three primary sources of data in creating his report: 1) documents and data provided by counsel and the Company; 2) relevant publicly available information and airline data sources including the Official Airline Guide schedule database and the U.S. DOT's Domestic Survey of Origin and Destination passengers; and 3) conversations with Company officials.  See Pl's Ex. 84 at ¶ 5.

[6] All of the "increases" in operational metrics described above are considered "statistically significant," meaning that these increases were all well in excess of what conventional statistical analysis would consider to be "random" occurrences.  Pl's Ex. 84 at ¶ 6. During this same time period, the operational performance metrics for *West* pilots, however, have remained consistent with historical averages.  Statistical "decreases" for East pilots were not observed in any area.

does not have its own maintenance personnel, thus making such write-ups much more likely to result in a flight delay or cancellation because the Company needs to rely on third party maintenance or even fly in a mechanic or part before the flight can depart.  Id. at ¶ 16.

## 2.    Fatigue Calls

Under US Airways's policies as well as FAA standards, a fatigued pilot should not fly an airplane.  See Evid. Hearing Tr. I at 118-19.  It is ultimately the individual pilot's responsibility to determine his or her level of fatigue, and pilots who report that they are fatigued are released from their trip.  US Airways alleges that USAPA has encouraged a concerted effort by pilots to decline to fly under the pretense of "fatigue" in order to disrupt operations.  USAPA maintains that it is only motivated by safety concerns.

On March 30, 2011, USAPA's Safety Committee released a video addressing pilot fatigue in which Captain Kubik states:

> If you are fatigued, you are done flying . . . The operational safety guidance is simply this: Don't fly fatigued!  If you are a reserve pilot, don't accept a trip if you are fatigued. If you are called for a ridiculous pairing that you know will put you in a fatigued state, don't accept it . . . Your union will be with you each step of the way.

Pl's Ex. 79.  The video also expressly discusses a subject of the collective bargaining between USAPA and US Airways: hotel selection.  In discussing the requirement that pilots not fly fatigued, Kubik states, "When enough of our pilots fully understand this requirement, and more importantly, act upon this requirement, then our substandard hotel situation will disappear with a speed you likely thought was not possible."  Id.  He also tells pilots, "If you make the decision to fly fatigued . . . you can absolutely expect the continued poor scheduling practices and hotel selections to continue."  Though Defendants argue that low quality hotels lead to fatigue, the Court is unconvinced that USAPA's sole concern was safety rather than gaining leverage in

16

negotiations over hotel selection.

Historically, only 17.5% of all days have had an East pilot fatigue call, but that number has increased sharply, and there has been at least one East pilot fatigue call on 42% of days since May 1. Pl's Ex. 84 at ¶ 19: Dr. Lee Report. From January 2008 to March 2011, there were 6.6 fatigue calls per month on average. But in May, June, and the first 25 days of July 2011, there were 17, 19, and 21 fatigue calls by East pilots, respectively.[7] The probability that the level of fatigue calls observed in May, June, and July of this year is the result of random statistical variation is less than 0.26%, 0.03%, and 1.98%, respectively. This Court thus finds evidence of an extraordinary increase in fatigue calls beginning in May 2011, and further finds that this increase was the result of illegitimate efforts by USAPA.

### 3. Longer Taxi Times and Pilot-Induced Delays

Pilots exercise considerable discretion in the speed at which they taxi the aircraft before take-off and after landing. However, because prolonged taxi times leads to flight delays that diminish overall operational performance, US Airways closely monitors the taxi times of each of its flights. Taxi times can be influenced by a variety of factors, including weather conditions and airport ground congestion; however, in a slowdown, pilots can prolong them to delay flights.

On March 23, 2011, the USAPA Safety Committee released a video that gave guidance to pilots on resisting on-time performance pressure, followed by a parallel written Update. Captain Kubik told pilots that "to help you combat this on time pressure and prevent being in a hurry," close the flight deck door and ensure that it remain closed until the numerous pre-flight

---

[7] The number of West pilot fatigue calls, in contrast, in May (three fatigue calls), June (five fatigue calls), and the first 25 days of July (1 fatigue call ) 2011, was below the historical average of 5.1. Pl's Ex. 84 at n. 29.

checks are complete.  Pl's Ex. 46: USAPA Safety Committee Operational Guidance; see Pl's Ex.

78: Video Trans.  Doing so, Kubik advised, will keep the flight attendants away and buck the

constant pressure to hurry.

US Airways argues that Kubik was signaling to pilots to delay operations, but Kubik

argued at the hearing that closing the flight deck door could just as easily speed up the pre-flight

process by eliminating interruptions.  This Court finds that in context, prolonged taxi times were

a feature of USAPA's slowdown campaign.  The video, and the USAPA publication that

followed, directed pilots to close the cockpit door and "take your time doing what you need to

do" as a way to resist on-time pressure, not as a way to become more efficient.  Pl's Ex. 46; see

Pl's Ex. 78.

Moreover, USAPA issued a publication entitled "The Iron Compass" on April 27, 2011

that addressed the taxiing issue under the heading "This Week's Safety First Review Items."

Pl's Ex 45.  It states: "The Department of Transportation counts a flight as on-time if it arrives

less than 15 minutes after the scheduled time shown in the Computer Reservations System;

therefore arrivals within 14 minutes (hence, A 14) are considered on-time."  Id.  The Court can

conceive of no reason for USAPA to include statements regarding the DOT's standards for an

on-time flight as a safety issue, other than to send a message to pilots to arrive 15 minutes late or

more in order to disrupt US Airways's operations.  During this same time, decals were placed on

aircraft and clipboards at US Airways with a frowning face, the words "HAD ENOUGH

YET?!!," and "+16," which appears to encourage pilots to arrive at least 16 minutes late.  See

Pl's Ex. 44.

The aircraft taxi times for flights operated by East pilots have greatly increased since

May 1, 2011.  See Pl's Ex. 84 at 6.  Specifically, the average "taxi-in" time (when a pilot taxis

the aircraft to the gate after landing) and "taxi-out" time (when a pilot taxis the aircraft from the gate to take off) for East pilots has increased by 0.63 and 0.90 minutes, respectively (after controlling for weather and other factors). Id. at 5. The chance of this being random is less than 1%. Likewise, East pilot-induced delays (for reasons other than the crew arriving late to the aircraft) have also risen sharply and remained well above the range of random variation since May 1, 2011. Id. at ¶ 18.

### 4. Discouraging Voluntary Flying by Check Pilots

USAPA further attempted to strain US Airways's operations by directing check pilots to reject voluntary flying. In addition to their regular duties, check pilots conduct periodic tests of other pilots as required by the FAA. Pl's Ex. 30 at ¶ 5: Hogg Decl. Under the collective bargaining agreement governing East pilots, US Airways may employ a procedure of voluntary flight assignments known as "FCR flying" (i.e., Flying at Company Request) if the Company is unable to cover all its flights with regular or reserve pilots. Id. Offering the flight to a check pilot is one of several processes that is used to staff flights that do not have a pilot assigned to them, generally because the pilot originally assigned to the flight has called in sick. Id.

Under status quo conditions, many US Airways check pilots will seek out this work because it allows them to increase their income, so historically, US Airways had no difficulty finding check pilots to accept these voluntary flight assignments. Id. at ¶ 6. On April 2, 2010 USAPA informed its members that "LINE PILOTS CONTINUE TO EXPRESS DISPLEASURE WITH . . . CHECK AIRMAN FLYING AT COMPANY REQUEST ON DAYS OFF!" Pl's Ex. 5 at 2. Accordingly, the publication continued, USAPA has "increase[d] its oversight of . . . Check Airmen that fly on their days off at company request . . . [and] authorized that the names of pilots that participate in this activity be published." Id. The

19

publication also told members that a USAPA committee "will begin seeking feedback from our line pilots to determine your level of resentment against those pilots willing to 'help out' with understaffing issues when we have pilots on furlough . . . [and] soliciting your suggestions on other sanctions that may be appropriate to deter this activity." Id.

Defendants argue that this communication did not direct pilots to reject voluntary flying, so this allegation is "simply baseless." (Doc. No. 60 at 8). This Court finds that the clear language of these communications demonstrates that USAPA did attempt to persuade pilots not to perform voluntary flying authorized by the collective bargaining agreement. However, US Airways has not provided sufficient proof that FCR flying actually "declined significantly," as it claims. US Airways relies on the declaration of Captain Hogg who states that after USAPA's April 2010 communication, check pilots "often do not accept FCR requests." Pl's Ex. 30 at ¶ 6. He states that from January 2010 through April 2010, check pilots flew, on average, 7.5 FCR flights per month; but from May 2010 through June 2011, check pilots flew, on average, only 2.3 FCR flights per month. Id. The Court finds that this data is statistically unreliable, not only because it does not come from a statistician, but also because it fails to provide any data showing when the decline began, whether the amount of FCR requests per month has remained constant, and whether the decline of accepted FCR requests has led to any disruption in the company's operations. Proof of any negative effect is further eroded by the fact that on December 18, 2009, USAPA's Charlotte Domicile Update made similar statements discouraging pilots from FCR flying ("We find this inexcusable with the threats of furloughs lingering and pilots shortages expanding"), and yet the very next month is the beginning of the period US Airways cited to establish that check pilots used to fly an average of 7.5 FCR flights per month before the significant decline. See Pl's Ex. 3.

5. **Discouraging Completion of Distance Learning**

The FAA requires pilots at commercial airlines such as US Airways to complete certain online training programs, known as "distance learning," by set deadlines each quarter. Pl's Ex. 31 at ¶ 16: Hogg Decl. If a pilot does not complete the required training by the deadline, he or she will not be "legal" to fly until the training is completed, and the Company will have to find a pilot who has completed the training to fly the trip. Id. Thus, if enough pilots collectively wait until just before the deadline or until after the deadline to complete the training, US Airways's operations will be disrupted. Id.

US Airways argues that a major element of the slowdown was a concerted decision by pilots not to complete their distance learning by the FAA-imposed May 31, 2011 deadline. Hogg declared that beginning in mid-April 2011, US Airways pilots began receiving both live and pre-recorded phone calls instructing pilots to not finish their distance learning on time in order to send a message to management. At least one caller stated that he was given a list of phone numbers to call and was calling everyone on the "phone tree." Pl's Ex. 30 at ¶ 17. In both the recorded calls and the live calls, the callers referenced "Safety First," stated "I'm on board," and asked if the recipient of the call was "on board." These are the same slogans found on the lanyards distributed by USAPA and included in other official USAPA communications. Id. at ¶ 18. In one recorded call, for example, the caller stated:

> This is the captain with a safety action update. I'm on board, and we need you on board, too. The distance learning deadline's approaching on May 31st. I am asking that you do not finish this module until the deadline of May 31st. The same request is being made of every pilot on the east coast, and it's very important that you join in the effort. I want to thank you in advance for your participation. This action is part of what will be an inspirating [sic] campaign to restore our careers. The result of this first safety action on our operation is unknown, however the purpose is to send a clear message to management. I know that participation will require a small sacrifice in our pay and schedules, but a small sacrifice now will pay large dividends in the end. I need to know if

21

you're on board and if you plan on participating now and in the future. If so, would you please provide me with your preferred contact number? Please leave a voicemail at this number with your best contact number for future communications. Thank you.

Id.; Pl's Ex. 82: Trans. of recorded call. US Airways's corporate security team was only able to determine that these calls were made from telephone numbers associated with untraceable pre-paid calling cards and disposable mobile phones. Pl's Ex. 31 at ¶ 19. Anonymous individuals also placed stickers in US Airways's pilot crew rooms and aircraft with the words "Distance Learning" with a circle around it and line through it (the well-known symbol for "No"). Id. at ¶ 20; Pl's Ex. 36: Distance Learning sticker.

As of May 28, 2011 (three days before the FAA-imposed distance learning deadline), 897 pilots had not completed their distance learning, 896 of whom were East pilots. Pl's Ex 31 at ¶ 23: Hogg Decl. Three days before the deadline is important because US Airways assigns pilots to "trips" that sometimes last four days, and a pilot that has not completed his or her training three days before the deadline could not be assigned to such a trip. Id. Moreover, the Company ascertained that 60% of these 897 pilots had completed 94% of the training module questions, which it argues shows that the pilots were simply waiting until the deadline or sometime thereafter to answer the last few questions. Id. As a result of the low completion rate among East pilots, and in order to ensure that there were enough pilots to fly scheduled flights, the Company requested and was granted an allowance from the FAA to extend the qualifications of those pilots who had not completed the required training beyond the initial deadline of May 31, 2011; without this extension from the FAA, US Airways asserts that it would have had to cancel numerous flights. Id. at ¶ 24.

On May 19, 2011, US Airways issued a written message to all pilots expressing that it was aware of the campaign to disrupt operations by delaying completion of distance learning and

22

informing pilots that "a concerted action such as this, intended to disrupt our operation, is considered to be an illegal job action and will not be tolerated. Pl's Ex. 37. It also reminded pilots to complete their training no later than May 25, 2011.

On May 24, 2011, USAPA responded to US Airways's message by stating that it was "unaware of any concerted action in this regard" and that it "in no way endorses or supports or condones any action in violation of the status quo provisions of the Railway Labor Act." Pl's Ex. 38. Captain Cleary declared that two weeks earlier, USAPA had also posted a message on its password-protected website,"advising pilots that USAPA does not endorse any concerted action in this regard and directing our members to refrain from engaging in any effort of the nature alleged in your letter." Pl's Ex. 12: Letter from Cleary to US Airways (May 10, 2011). USAPA did not, however, affirmatively direct its pilots to complete distance learning, and the completion figures show that the message was ineffective.

Defendants argue that no historical data is supplied, so there is no way of knowing whether this completion rate is unusual. It also points out that US Airways did not provide any data as to the number of pilots who failed to complete the course by the actual deadline of May 31, 2011 (instead of three days before the FAA-deadline). Further, it argues there would be no operational disruption from pilots waiting until the last day to complete the training unless those pilots were in fact scheduled to fly on June 1st, but US Airways failed to provide any data on that point. USAPA also objects to the anonymous calls and stickers as hearsay.

Even without historical data on distance learning completion rates, there is still enough evidence for this Court to find that the pilots' delay in completing this training was unusual, and indeed, was part of a concerted effort to disrupt the airline. US Airways's reaction to the distance learning situation – sending a letter to USAPA more than a month before the deadline

23

demanding that USAPA ensure that pilots finish their training on time (Pl's Ex. 10), sending a letter to all pilots reminding them to complete their Distance Learning despite being pressured not to (Pl's Ex. 37); and ultimately seeking FAA involvement – shows that the Company was deeply concerned about pilots' completion rate on their distance learning. US Airways's reaction only makes sense if the completion rate was unusual. Moreover, USAPA's insistence that pilots were not really behind schedule in completing their distance learning because the FAA-deadline was not until May 31, 2011 is inconsistent with US Airways's scheduling practices, of which the pilots were aware[8], and the company's unambiguous message to all pilots to complete the training "no later than May 25, 2011." See Pl's Ex. 37. This Court also finds that the anonymous calls and stickers are not hearsay because they were not offered for the truth of the statements therein; rather, they were offered as additional evidence of conduct consistent with a slowdown, which the defendants never made effective efforts to negate, even after it was brought to their attention.

### 6. Intimidating Pilots who are not "On Board"

USAPA has intimidated pilots who refuse to go along with the slowdown. For example, on June 23, 2011, USAPA's Charlotte Domicile issued an Update asking pilots to report their colleagues who accept flight assignments from the scheduling department referred to in the East pilot CBA as POTAs (Priority of Trip Assignments). Pl's Ex. 1 at ¶ 29: Hemenway Decl; Pl's Ex. 13: USAPA Update. The publication instructs pilots that they do not have to answer the phone or return the call when the scheduling department calls, and goes on to say that pilots who

---

[8] In fact, in the anonymous phone call asking pilots not to finish the distance learning until the deadline, the caller expressly acknowledges that it will disrupt scheduling: "[P]articipation will require a small sacrifice in our . . . schedules, but a small sacrifice now will pay large dividends in the end." Pl's Ex. 82.

accept POTAs will be recognized in future USAPA publications and encourages nominations and input for "The Doug Parker[9] Golden Bonus Award" to be given "in recognition of any pilot who goes above and beyond the call of duty to make sure Doug Parker and his management team continues to 'earn' their hefty bonuses." Pl's Ex. 13. The Update discussed the actions of two pilots who were nominated for the Doug Parker award, including a pilot who answered a call from the scheduling department on the pilot's day off and accepted a last-minute POTA assignment in order to prevent a flight cancellation (which USAPA sarcastically referred to as "valiant efforts"). Id.

Pilots also received numerous anonymous communications designed to intimidate them into participating in the slowdown. USAPA never did anything to stop the intimidation. For example, on July 24, 2011, an anonymous text message was sent to East pilots criticizing a US Airways pilot by name, stating:

> Seems like we have our first winner for the COMPANY SUCK UP AWARD... PINK PANTY AWARD or whatever you want to call it. This A330 CAP on Reserve, on July 15th had 1 Day Available, suddenly on July 16th he is on a . . . 3 day trip. Congratulations go to TOM BELTZ as our first winner. Keep up the good work by screwing all your fellow pilots that are trying to get a contract we deserve. If you have a good reason please let everyone know.

Pl's Ex. 14. Around this same time, a card was placed in a pilot's mailbox with an image of pink women's underwear and the words: "CONGRATULATIONS! You're a WINNER! Your heroic effort to help management achieve their bonus checks has earned you the Pretty Pink Panties award[.] Do you want a new contract? EARN IT." Pl's Ex. 15.

More anonymous e-mails have also been distributed threatening pilots who do not participate in USAPA's campaign. See, e.g., Pl's Ex. 58 (telling a "snitch" who forwarded an

---

[9] Doug Parker is US Airways's Chairman and Chief Executive Officer.

email to management that [y]ou better hope we never find out who YOU are," listing pilots who flew the most time in July by name as well as the number of block hours flown, and singling out one pilot as a "whore" for flying the most time in July); Pl's Ex. 16 (telling pilots that everyone needs to drop a trip in July or August, and that "[w]e will know who is dropping a trip and who is not, and we WILL PUBLISH THE LIST"); Pl's Ex. 17 (instructing pilots to take steps to hurt the Company's on time performance and stating that "[p]eer pressure is an important aspect of our effort . . . We will make sure that all of our pilots know who is not strong enough to walk the walk. These are serious times and this is no place for pansies").

Although USAPA has asserted that it cannot be held responsible for the improper acts of anonymous individuals, this Court concludes that USAPA has ratified, if not authorized, such acts by knowing about them and failing to take any meaningful action to discourage them. The connections between the anonymous harassment and USAPA are abundant. For example, the number of "block hours" flown by US Airways line pilots references in the "Pink Panties" email is maintained in a restricted portion of US Airways's Crew Activity Tracking System (CATS) database, which is only accessible to a limited number of people. Besides select members of US Airways's management, there are 17 USAPA members with access to the CATS database. Pl's Ex. 61 at ¶ 4: Supp. Hogg Decl. USAPA had also used a strikingly similar method of shaming pilots into participating in the slowdown, including the same slogans and "awards." In addition, the method of communicating the anonymous harassment by email and text message mirrored USAPA's methods of communicating to its members.

The record also contains evidence that USAPA relied on peer pressure to accomplish its goals and encouraged its members to do the same. USAPA expressly told its members, for example, that "[p]eer pressure is very important," publicly criticized pilots who disregarded its

26

guidance, and selectively handed out "Safety First" and "I'm on Board" lanyards to pilots who embraced its agenda.  See, e.g., Pl's Ex. 41 at 10; Pl's Ex. 42; Pl's Ex. 13.  USAPA can hardly be surprised that some pilots employed peer pressure after repeatedly encouraging them to do just that.  Moreover, West pilots had accused USAPA of being responsible for the anonymous communications, so at the very least, USAPA must have known that the anonymous harassment was going on.  See Pl's Exs. 19-21: communications from West Pilots to US Airways.  Finally, the record is devoid of evidence that USAPA made any effort to discourage such conduct.

### F.    The Slowdown has Harmed US Airways

As described above, the evidence establishes that USAPA's East Pilots have engaged in a concerted slowdown using delay tactics that cannot be explained by chance.  The striking increases in pilot maintenance write-ups, pilots fatigue calls, pilot induced departure delays, and prolonged taxi times at US Airways among East pilots since May 1, 2011 has negatively impacted the Company's operational performance.  This has resulted in significant harm to the company and inconvenience to passengers of the airline.

US Airways's on-time performance rankings have dropped since May 1, 2011.  While the company has ranked either first or second among its peers in terms of on-time performance (as tracked by the DOT) in 2008, 2009, 2010, and in the first four months of 2011, it ranked next to last in May of this year.  See Pl's Ex. 85 at ¶ 13: Hester Decl.  Likewise, the DOT ranking for June 2011 placed US Airways last compared to other major network carriers with respect to both on-time arrivals and customer complaints.  Doc. No. 86 at ¶ 2: Supp. Hester Decl. On a historical basis, the percentage of US Airways' flights (flown by East pilots) arriving on time (per the DOT's standard of within 14 minutes of the scheduled arrival time) has averaged 79%.  Pl's Ex. 84 at ¶ 6: Lee Report.  Since May 1, however, this figure has dropped by almost 11 percentage

points (after controlling for weather and other factors).  Id.  Put differently, this has resulted in

over 8,000 additional East mainline flight delays since May 1st.  Id.  In addition, since May 1st,

Dr. Lee estimates that East pilot actions have resulted in more than 1% of all East flights being

cancelled. Id. at ¶ 6.  This amounts to, on average, nine to ten cancellations per day since May

1st, caused by the East pilots' actions.  Id.

US Airways's witnesses testified credibly that "delays drive a lot of dissatisfaction for

customers," so the slowdown ultimately translates to fewer customers.  Evid. Hearing Tr. Trans.

I at 75.  When an airline has strong operational performance, it attracts more customers, and an

airline with weak operational performance attracts fewer customers.  Pl's Ex. 85 at ¶ 7.  Since

May 1st, cancelled flights alone have impacted an estimated 1,173 passengers a day, or

105,500 members of the traveling public since May 1st.  Pl's Ex. 84 at ¶ 6: Lee Report.

The slowdown is also causing direct financial harm to US Airways through increases in

costs and lost revenue.  Dr. Lee credibly estimates that, should the current level of pilot job

action persist, US Airways's damages from the slowdown would be approximately $377,000 per

day.  Id. at ¶ 54.  This represents approximately $348,000 per day in forgone passenger revenue

from the erosion of passenger goodwill and the decline in relative service quality, more than

$10,000 per day in costs associated with a passenger's bags missing a connection, and $18,801

per day in added fuel consumption, wages, and engine maintenance costs from prolonged taxi

times.  Id. at ¶¶ 46, 49, 52.

After the Preliminary Injunction hearing, Cleary submitted an email from US

Airways's Corporate Communications regarding the airline's baggage and on-time performance

in July, 2011, which he claims "is contrary to the evidence and assertions made by US Airways

in its filings with the Court."  Doc. No. 71 at 1.  The email contains no information connecting

28

the July baggage performance to East pilot behavior, and it provides no historical data that would allow this Court to make a meaningful conclusion about how US Airways's July baggage performance in 2011 compares to prior years. Moreover, the mere statement by Corporate Communications that [o]ur on-time performance also improved from May and June," without any additional data whatsoever, does little to undermine the substantial evidence before this Court of a slowdown.

### G.    US Airways's Response to Slowdown

US Airways has made several attempts to get USAPA to stop the slowdown. On three separate occasions, from December 23, 2010 to July 1, 2011, US Airways sent letters to USAPA stating that USAPA's actions violate its status quo obligations under the RLA and asking (then demanding) that USAPA take actions to stop the slowdown. See Pl's Ex. 6; Pl's Ex. 8; Pl's Ex. 10. On July 1, 2011, US Airways also sent a letter to Captain Kubik, directing him to "not contradict the Company's Standard Operating Procedures" or face discipline. Pls' Ex. 72. In response to these letters, USAPA vehemently denied that it was engaged in a slowdown and, with two exceptions, refused to do anything to stop the actions of the pilots. See Pl's Ex. 7: Letter from USAPA to US Airways (January 28, 2011); Pl's Ex. 12: Letter from USAPA to US Airways (May 10, 2011). Rather, as explained above, the illegal slowdown has only escalated over time. US Airways has also "counseled, warned, and disciplined pilots engaging in slowdown tactics in an attempt to deter this activity." Pl's Ex. 30: Hogg Decl. at ¶ 45.

The first time USAPA addressed pilots about the slowdown was when it posted a short message about distance learning on its website, as previously discussed. Then, on August 17th, 2011, the same day this Court denied USAPA's motion to dismiss, transfer, or stay this case, Captain Cleary sent a "President's Message" to all pilots updating them on the instant action as

well as the lawsuit pending in the Eastern District of New York.  See Pl's Ex. 29.  A similar

Update was issued by the Phoenix Domicile the day before.  See Pl's Ex. 27.  Although the

President's Message was a vast improvement over previous USAPA communications because it

actually told pilots not to intentionally cause any delay for the purpose of altering the status quo,

it is too little, too late.  The message denies any wrongdoing by the association or the pilots,

denied the concerted nature of the action by referring only to "individual anonymous pilot

messages," and completely ignores the harassment of pilots not participating in the slowdown.

Moreover, the tone of the message subverts the focus on pilot behavior by fomenting anger

against US Airways for how it has behaved in their "fight."  And USAPA does not retract or

clarify any of its prior statements, so this message is dwarfed by months of communications

encouraging the slowdown.

## III.    CONCLUSIONS OF LAW

### A.    Section 2, First of the RLA imposes a duty on USAPA to exert every reasonable effort to avoid interruptions to US Airways's operations.

One of the purposes of Congress in enacting the RLA was to avoid any interruption to the

nation's transportation systems.  See 45 U.S.C. § 151a.  The RLA seeks the "prompt and orderly

settlement" of disputes and encourages collective bargaining in order to prevent wasteful strikes

and interruptions to interstate commerce.  See id.; United Air Lines, Inc. v. Air Line Pilots Ass'n

Int'l, 563 F.3d 257, 273 (7th Cir. 2009) (hereinafter "United II"); United Air Lines, Inc. v. Int'l

Ass'n of Machinists and Aerospace Workers, 243 F.3d 349, 361 (7th Cir.2001) (hereinafter, "

IAM" ), cert. denied, 534 U.S. 889 (2001); Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.,

802 F.2d 886, 906 (7th Cir.1986) (hereinafter "ALPA").  In order to avoid any interruptions

growing out of a dispute between a carrier and its employees, Section 2, First of the RLA

30

imposes a duty upon "all carriers, their officers, agents, and employees to exert every reasonable

effort to make and maintain agreements concerning rates of pay, rules, and working conditions."

45 U.S.C. § 152, First.  The Supreme Court has called this duty the "heart" of the RLA.

Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 377-78 (1969).

Accordingly, the obligation to make and maintain agreements without interruption to the

carrier's operations is not "a mere statement of policy or exhortation to the parties"; rather, it is

an affirmative legal obligation, "enforceable by whatever appropriate means might be developed

on a case-by-case basis," including injunction.  Chicago & N.W. Ry. Co. v. United Transp.

Union, 402 U.S. 570, 577 (1971).

      The RLA demands that parties refrain from employing economic self-help from the

moment a union is certified until the parties have exhausted the negotiation and mediation

process provided for in the RLA.  See, e.g., Consol. Rail Corp. v. Ry. Labor Executives' Ass'n,

491 U.S. 299, 302-03 (1989).  The prohibition against a union engaging in economic self-help

applies not only to strikes but also to any alteration of the status quo that is designed to put

economic pressure on the carrier.  See Delta, 238 F.3d at 1309.  The status quo provisions are

"central" to the RLA's design as part of an "integrated, harmonious scheme for preserving the

status quo from the beginning of a major dispute through the final 30-day 'cooling-off' period."

Detroit & Toledo Shore Line R.R. v. United Transportation Union, 396 U.S. 142, 148–52

(1969).  If either side unilaterally alters the status quo during the bargaining and mediation

process, a court may issue an injunction to put a stop to that party's illegal self-help.  See, e.g.,

Consol. Rail Corp., 491 U.S. at 303.  This rule empowers courts to "enjoin not only strikes but

also 'union conduct . . . which has the consequences of a strike,' such as refusal of overtime,

slowdowns and sit-ins."  IAM, 243 F.3d at 362 (quoting ALPA, 802 F.2d at 906); accord

Elevator Mfrs.' Ass'n v. Local 1, Int'l Union of Elevator Constructors, 689 F.2d 382, 386 (2d Cir.1982) ("That the overtime was designated as voluntary in the contract does not ... render the concerted refusal to perform it any less a strike.") (internal quotation marks and citations omitted). For example, federal courts have enjoined slowdowns, e.g., United II, 563 F.3d 272; IAM, 243 F.3d at 369; Pan Am. World Airways, Inc. v. Transport Workers Union, No. CV 84-3357, 1984 WL 49055 (E.D.N.Y. Aug.20, 1984); Trans World Airlines v. Int'l Ass'n of Machinists, No. 74 CV 460-W-2, 1974 WL 1170 (W.D.Mo. Aug.22, 1974); sick-outs, e.g., United II, 563 F.3d 275; Pan Am., 1984 WL 49055; Pan Am. World Airways v. Indep. Union of Flight Attendants, No. 81 Civ. 3785, 1981 WL 2367 (S.D.N.Y. July 20, 1981); work-to-rule programs, e.g., Long Island R.R. Co. v. Sys. Fed'n No. 156, Am. Fed'n of Labor, 368 F.2d 50, 52 (2d Cir.1966); Tex. Int'l Air Lines, Inc. v. Air Line Pilots Ass'n Int'l, 518 F.Supp. 203, 216 (S.D.Tex.1981); "safety" campaigns, e.g., IAM, 243 F.3d at 368-69 & n. 14; increased write-ups of maintenance problems, e.g., Texas Int'l Air Lines, Inc., 518 F.Supp. at 207; and concerted refusals to work overtime, e.g., Delta, 238 F.3d at 1311.

To be subject to injunctive relief under the status quo provision of the RLA, it is not necessary that the union authorize or otherwise ratify a slowdown. It is enough that the union fail "to exert every reasonable effort to prevent or discourage a strike or a concerted work action." See United II, 563 F.3d 257 (upholding the district court's preliminary injunction against a pilots' union where the union authorized a slowdown campaign and did not make reasonable efforts to halt the pilots' alleged sick-out) ; Delta, 238 F.3d 1300 (holding that the district court erred in refusing to enjoin a pilots' union where the union had not done "everything possible" to stop its members' no-overtime campaign); IAM, 243 F.3d 349 (holding that the district court erred in denying an injunction against an airline's auto mechanic's union whose

32

members were engaging in a slowdown, on the grounds that the problem could be more effectively addressed by the airline). Thus, even if this court were to conclude that USAPA had not instigated the slowdown, the association would still have an affirmative duty to exert every reasonable effort to stop it. See Delta, 238 F.3d at 1310 & n. 22 ("[W]e need not rule on whether ALPA has ratified the pilots' actions . . . the duty of ALPA under the RLA is sufficiently high that even if it has not sponsored or ratified the unlawful job action by the pilots, it has a duty to end such unlawful action."); IAM, 243 F.3d at 363 ("Once a court determines that such a concerted work action is occurring in violation of the RLA, an injunction can issue ordering the union to observe its statutory duty by trying to stop it").

**B.     USAPA has violated Section 2, First of the RLA.**

**1)     USAPA Directly Encouraged Certain Aspects of Slowdown**

USAPA does not dispute that it has encouraged pilots to change their behavior regarding maintenance write-ups, calling in fatigued, and pre-flight procedures that affect taxi times. While USAPA asserts that these actions were solely about safety, the association's communications plainly encouraged East pilots to engage in this conduct for the purpose, in part, of obtaining a favorable CBA.

The court further concludes that USAPA has encouraged a much broader job action through slogans like "Safety First" and "I'm On Board." The evidence indicates that such instructions were intended by USAPA and, likewise, understood by US Airways pilots to signal that pilots should engage in conduct that would increase flight delays and cancellations, as well as the airline's operating costs. The evidence also established that USAPA used a variety of communication methods, including email and text message, to deliver these instructions. There is insufficient evidence, however, to hold Defendant Cleary individually responsible for the

33

slowdown, although he will, of course, be bound by this Court's preliminary injunction. See Fed. R. Civ. P. 65(d)(2) (establishing that an injunction binds "the parties' officers, agents, servants, employees, and attorneys").

### 2) USAPA did not Exert Every Reasonable Effort to Stop the Slowdown

In addition to the Court's findings on USAPA's instigation of the slowdown, it has violated its duty to exert every reasonable effort to stop it. USAPA clearly knew its East pilots were engaging in status quo violations: US Airways brought it to the association's attention multiple times, placards encouraging the slowdown were placed on airplanes and in break rooms where USAPA frequented, bag tags encouraging safety on one side and a workers' strike on the other were mailed from USAPA's headquarters, and USAPA's website, "phone tree," and email list were used by pilots to communicate about the slowdown. At the hearing, USAPA's witnesses never suggested that they were unaware of the anonymous communications and harassment encouraging the slowdown. Yet there is no evidence, nor even any argument except with regard to distance learning, that USAPA published anything that was sincerely meant to discourage this conduct or otherwise took any serious actions to do so until this Court ruled against USAPA's motion to dismiss, transfer, of stay the instant against. To the contrary, USAPA continued to publish the sorts of communications and directives that were intended to encourage East pilots to engage in a slowdown campaign.

### C. Action is not Barred by Unclean Hands Provision

Defendants argue that Plaintiff's Motion for Preliminary Injunction is barred by the Norris-La Guardia Act (NLGA). Section 1 of the NLGA states: "No court of the United States . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions

34

of this chapter." 29 U.S.C.A. § 101. Defendants contend that US Airways has not strictly

conformed with the NLGA because they have violated Section 8 of the Act, which provides that:

> No restraining order or injunctive relief shall be granted to any complainant who has
> failed to comply with any obligation imposed by law which is involved in the labor
> dispute in question, or who has failed to make every reasonable effort to settle such
> dispute either by negotiation or with the aid of any available governmental machinery of
> mediation or voluntary arbitration.

29 U.S.C. § 108. As alleged in the Eastern District of New York action, US Airways has

violated Section 8's "clean hands" requirement by committing status quo violations of its own

and by failing to make every reasonable effort to resolve this dispute. Thus, Defendants argue,

this Court lacks subject matter jurisdiction to issue an injunction. See Doc. No. 60 at 24:

Defendant's Brief in Opposition to Preliminary Injunction.

Even if US Airways did violate the status quo or some other legal obligation, that still

does not form "an absolute bar to injunctive relief against status quo violations." IAM, 243 F.3d

at 365 n.11, (citing ALPA, 802 F.2d at 901). Rather, this Court must weigh "the competing

equities to determine whether applying section 8's bar to injunctive relief would serve to further

underlying purposes of both the RLA and the NGLA." Id. In so doing, "the imperatives of the

RLA may override § 8," and "a party's lack of 'clean hands' under § 8 may be overcome by a

balancing of the interests, particularly where it is the public interest involved." See IAM, (citing

Illinois Central R.R. Co. v. Brotherhood of R.R. Trainmen, 398 F.2d 973, 976 (7th Cir.1968)

(quotation omitted).

Here, the heart of the RLA is at stake because the slowdown activities that US Airways

seeks to enjoin contravene USAPA's duty to exert every reasonable effort to make and maintain

agreements. See. 45 U.S.C. § 152, First. The balancing of hardships and the public interest

weigh in favor of issuing an injunction. US Airways has demonstrated the heavy toll this

slowdown has taken on both the Company and the flying public (as described above). In contrast, USAPA will not experience any legitimate hardship as a result of being enjoined from violating the law. The limited evidence presented by Defendants regarding US Airways's conduct allegedly in violation of the RLA – which primarily consisted of the testimony of one pilot who was taken off of flying status for 20 days for refusing to fly a certain aircraft which she believed was unsafe, even though it was a legal aircraft (Hearing Tr. I at 202) and another pilot whose pay was docked for not being available after he accepted the scheduler's offer to refuse to fly a certain flight based on fatigue (Hearing Tr. II at 218) – is greatly outweighed by all of the evidence favoring an injunction.[10]

### D. A Preliminary Injunction is not Prohibited by the Norris-La Guardia Act

Defendants argues that the court should not issue a preliminary injunction because §§ 6 and 7(a) of the NLGA prohibit it. Section 7 limits the jurisdiction of the federal courts to issue injunctions in cases involving or growing out of a labor dispute, and provides in part that "no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof." 29 U.S.C. § 107(a). Section 6 of the NLGA provides:

> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

---

[10] This Court again notes that it is only evaluating such evidence to determine the limited issue of whether the unclean hands provision of the NLGA precludes an RLA injunction. This purpose differs from the Eastern District of New York action, where the Court will be determining whether USAPA is entitled to relief based on any violations of the RLA.

36

29 U.S.C. § 106. Defendants argue that US Airways has not met the Section 6 "clear proof" standard because it has not demonstrated a "definite and substantial connection" between USAPA and the unlawful conduct. See Ritchie v. United Mine Workers of Am., 410 F.2d 827, 835 (6th Cir. 1969). Defendants also maintain that the "clear proof" standard applies to requests for injunctive relief. See Air Line Pilots Ass'n Int'l v. United Air Lines, 802 F.2d 886 (7th Cir. 1986).

US Airways responds that the purpose of Section 6, as the Supreme Court noted in United Brotherhood of Carpenters v. United States, 330 U.S. 395 (1947), is to relieve unions "from liability for damages or imputation of guilt" for the unauthorized acts of individual officers or members. Id. at 403. Thus, "it is readily apparent that [Section 6] applies only (by its own terms) to liability for damages or criminal responsibility" and not to requests for injunctive relief. Charles D. Bonanno Linen Serv., Inc. v. McCarthy, 532 F.2d 189, 191 (1st Cir. 1976); see also Mayo v. Dean, 82 F.2d 554, 556 (5th Cir. 1936) (Section 6 "might prevent punishment for contempt or the recovery of damages, but clearly was not intended to apply to the issuance of an injunction to prevent future acts of coercion in a case where such relief would be proper"); Suffolk Constr. Co. v. Local 67, United Bhd. of Carpenters, 736 F. Supp. 1179, 1182 (D. Mass. 1990) ("the prohibition of § 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, does not apply to injunctions but only to claims for damages").

Regardless of the proper standard, this Court finds that US Airways has offered enough "clear proof" of USAPA's involvement in the work slowdown to satisfy the RLA standards. In addition to the vast statistical evidence, US Airways introduced numerous formal communications from USAPA that explicitly instructed pilots to change their normal behaviors under the guise of safety. Defendants offer no satisfying explanation why its communications

37

beseeched pilots to put safety first in the context of blaming US Airways for the lack of progress in the contract negotiations, why it told pilots that the Safety Culture Survey would have "strong implications beyond just safety," or why the "I AM **ON BOARD** SAFETY FIRST!/I'VE HAD ENOUGH I AM READY TO **STRIKE**" bag tags were mailed from its own headquarters. Nor did Defendants explain why the Strike Prep Committee advised pilots to "MEET OR EXCEED safety standards."

In addition, USAPA's distribution of the "Safety First" and "I'm on Board" lanyards to cooperating pilots involve the type of slogans that courts have commonly recognized as signals for a work slowdown. See IAM, 243 F.3d at 366 (holding that union's bulleting exhorting members to "work safe" was a commonly recognized signal among union mechanics for a work slowdown) (citing New York Times Co. v. Newspaper & Mail Deliverers Union, 740 F.Supp. 240, 244 (S.D.N.Y.1990) (finding that a union chapel chairman's directive to members to "adhere to strict contractual requirements in making their deliveries" was a call for a "slowdown from normal operations"; Tex. Int'l Airlines, Inc. v. Air Line Pilots Ass'n Int'l, 518 F.Supp. 203, 210-11 (S.D.Tex.1981) (finding that council chairman's letter to union members advising them to "adhere to company policies, and contractual agreements"; "not to neglect even the most minor write ups"; ... and "to check every item on the checklists" was sent with the understanding that many union pilots would interpret it as a call for a slowdown)). Although the posting on Distance Learning and the President's Message told members that USAPA did not condone illegal job actions, such statements are overshadowed by all of the other "Safety First" type messages that conspicuously encouraged and applauded the slowdown. At a time when USAPA was aware that anonymous individuals were calling for a slowdown using language borrowed from its own publications, this Court is incredulous that USAPA would have continued to use

38

the same language unless it intended to signal that it approved of the slowdown, especially given that USAPA never denied that such language can operate as code for a slowdown.

This is exactly the kind of evidence that courts have suggested could provide "clear proof" of a union's authorization of a slowdown. See IAM, 243 F.3d at 367 (finding that statistical evidence plus union bulletins prominently telling members to "work safe" established clear proof of union's involvement in work slowdown); ALPA, 802 F.2d at 905 (suggesting that statistical evidence of a sickout plus, inter alia, "a notice posted on a union bulletin board" could indicate union involvement in a sickout under § 6) (discussing Pan American World Airways, Inc. v. Independent Union of Flight Attendants, 93 Lab.Cas. (CCH) ¶ 13,307, 20,035, 1981 WL 2367 (S.D.N.Y. July 20, 1981) (finding evidence of union involvement in a sickout sufficient to support an injunction where, inter alia, the union did not take sufficient steps to disavow a planned sickout by its members and where an unsigned notice reporting on the negotiations and indirectly calling for the sickout was posted on a locked union bulletin board to which only the union had access)).

### E. Injunctive relief is necessary to end the slowdown.

Preliminary injunctions are an extraordinary remedy whose primary function is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit. In re Microsoft Corp. Antitrust Litigation, 333 F.3d 517, 525 (4th Cir. 2003). A plaintiff seeking a preliminary injunction must give notice to the opposing party under Federal Rule of Civil Procedure 65 and establish all four of the following elements: (1) plaintiff is likely to succeed on the merits; (2) plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in plaintiff's favor; and (4) an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008). The most recent Supreme Court test was

39

adopted by the Fourth Circuit in <u>Real Truth About Obama, Inc. v. Fed. Election Comm'n</u>, 575 F.3d 342, 346-47 (4th Cir. 2009), vacated on other grounds, 130 S.Ct. 2371 (2010) (memorandum opinion), reissued in pertinent part, 607 F.3d 355 (4th Cir. 2010), overruling <u>Blackwelder Furniture Co. v. Selig Mfg. Co.</u>, 550 F.2d 189 (4th Cir. 1977). In <u>Winter</u>, the Supreme Court emphasized that the plaintiff must demonstrate more than just a "possibility" of irreparable harm and a strong showing of likelihood of success on the merits. <u>Winter</u>, 129 S.Ct. at 375.

However, in the context of a "major" dispute[11] under the RLA such as that presented here, district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury. <u>See</u> <u>Consolidated Rail Corp.</u>, 491 U.S. at 303 (holding that "district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures without the customary showing of irreparable injury); <u>United Air Lines, Inc. v. Air Line Pilots Ass'n Int'l</u> (hereinafter "<u>United I</u>", 2008 WL 4936847, 45 (N.D. Ill., 2008) ("In an action under Section 2, First of the RLA, there is no need to address the issue of irreparable injury, because such a showing is, as a matter of law, not required).

**1)     US Airways has demonstrated likelihood of success on the merits.**

Based on the record, this Court concludes that US Airways has established a likelihood of success on the merits of its claim should this case proceed to trial. During these proceedings,

---

[11] Disputes over the meaning of a collective bargaining agreement governed by the RLA are "minor disputes" in RLA jargon and are subject to compulsory arbitration. <u>Union Pacific R.R. v. Brotherhood of Locomotive Engineers</u>,130 S.Ct. 584, 591–9375 (2009). All other disputes are "major" and must be referred to a bargaining and mediation process prescribed by the Act, as in section 6, 45 U.S.C. § 156. <u>See</u> <u>International Broth. of Teamsters Airline Div. v. Frontier Airlines, Inc.</u>, 628 F.3d 402, 404 -405 (7th Cir. 2010)

the parties have thoroughly developed the record. The defendants had three weeks after US Airways filed its complaint to conduct discovery and prepare its defenses before the preliminary injunction hearing commenced, and they were aided by the fact that they had already conducted discovery on related issues for their action against US Airways in New York. Much of the relevant evidence was in USAPA's control. The defendants had an unrestricted amount of time to cross-examine Plaintiff's witnesses and present their own witnesses. The hearing itself lasted two days, during which the parties presented live testimony from eleven witnesses, submitted declarations from ten witnesses (many of whom submitted multiple declarations), and introduced over 100 exhibits. The Court is convinced that the defendants have been heard on their defenses and are unlikely to be victorious should this case go to trial.

Defendants argue that they were disadvantaged by the pace of these proceedings. However, this Court stayed ruling on the TRO, which actually provided a scheduling advantage to defendants; had the TRO been granted instead, the schedule would necessarily have been even more accelerated. In addition, although defendants did not submit their own expert report from a statistician, they engaged in a lengthy cross-examination of Dr. Lee in which they attempted to find limitations in his methodology. Defendants were unable to call into question the soundness of Dr. Lee's analysis.

### 2) US Airways is likely to suffer irreparable harm in the absence of preliminary relief.

There is no need to address the issue of irreparable harm because such a showing is not required in actions arising under Section 2, First of the RLA. Even if a showing of irreparable injury were required, US Airways would satisfy this requirement; it has shown that unlawful acts will continue unless restrained and substantial and irreparable injury will follow. This

41

conclusion is based on the evidence of flight delays, flight cancellations, and other losses

incurred by the company as a result of USAPA's slowdown, in addition to the unlawful pressure

the slowdown places on US Airways in its ongoing contract negotiations with USAPA.

Although "some of this harm may be compensated by a damage award if that were available

under the RLA, there is no way to calculate the loss of customer goodwill or damage to the

airline's reputation . . . and no way to remedy [the union's] exertion of unlawful bargaining

pressure on [the airline]." United I, 2008 WL 4936847, 45.

      **3)**      **The balance of the equities tips in favor of US Airways.**

Because USAPA is engaged in an illegal slowdown, the balance of equities clearly tips in

favor of US Airways.  On one side, rests the enormous disruption and harm to US Airways and

the traveling public, while on the other side, rests no legally cognizable harm to USAPA because

an injunction would only require it to satisfy its existing legal duty under the RLA.  To the extent

that USAPA is concerned that an injunction would hamper its legitimate safety efforts, this

Court declares that it in no way intends to interfere with the duty of pilots in command to ensure

the safety of their passengers and equipment.  The court's injunction therefore should not

dissuade good faith efforts to ensure the safe operation of the airline.

      **4)**      **An injunction is in the public interest.**

An injunction is in the public interest considering that the central purpose of the RLA

was to protect the public from interruptions to transportation caused by labor disputes, which is

occurring here.

**IV.**    **CONCLUSION**

For the foregoing reasons, this Court finds that Plaintiff has sufficiently demonstrated the

necessity of a preliminary injunction to prevent the actual and imminent irreparable harm posed

42

by USAPA's actions. Therefore, the Court **GRANTS** Plaintiff's Motion for Preliminary Injunction (Doc. No. 10) against USAPA and **HEREBY ORDERS**:

1.      USAPA and its members, agents, and employees, and all persons and organizations acting by, in concert with, through, or under it, or by and through its order, are enjoined from permitting, instigating, authorizing, encouraging, participating in, approving, or continuing any interference with Plaintiff's airline operations, including, but not limited to, any slowdown, strike, work stoppage, sick-out, work to rule campaign, or any concerted refusal to perform normal pilot operations in violation of the RLA, pending a hearing on the permanent injunction.

2.      USAPA shall take all reasonable steps within its power to prevent the aforesaid actions and to refrain from continuing the aforesaid actions if commenced, including, but not limited to, the following:

     a.      Instructing all pilots represented by USAPA and employed by Plaintiff to resume their normal working schedule and practices and providing Plaintiff a copy of all such instructions;

     b.      Notifying all pilots represented by USAPA and employed by Plaintiff, by the most expeditious means possible, of the issuance, contents, and meaning of this Preliminary Injunction and providing Plaintiff a copy of all such notices;

     c.      Including in such notice a directive from USAPA to US Airways's pilots who are engaging in a concerted refusal to perform normal pilot operations, including but not limited to, slow taxiing, writing up all maintenance items, calling in fatigued, delaying flights, refusing to answer a call from the scheduling, refusing to fly an aircraft that meets the requirements for flight, or refusing to accept voluntary or

43

overtime flying, to cease and desist all such activity and to cease and desist all exhortations or communications encouraging same.

d.    Posting the notice described above on Defendant USAPA's internet websites and providing Plaintiff a copy of the notices;

e.    Including the contents of such notice on any and all recorded telephone hotlines under control of USAPA, until such time as the Court has acted on Plaintiff's Motion for a Permanent Injunction, and providing Plaintiff a copy of all such messages; and

f.    Distributing the contents of such notice through all non-public communication systems maintained by USAPA, including any telephone trees, text message lists, pilot-to-pilot communication systems, or similar systems, and providing Plaintiff a copy of the notices.

3.    USAPA is prohibited from including in such notices (or distributing contemporaneously with such notices) any statements that are intended or could reasonably be interpreted to mean that pilots should continue to engage in the previously-described conduct notwithstanding the Preliminary Injunction.

4.    USAPA shall report to the Court by 5 p.m. on October 4, 2011, by sworn affidavit, the methods used to effect the notice described above to all USAPA-represented pilots, and furnish to the Court copies of all notices required to be furnished to the Plaintiff under the Court's Order.

44

Signed: September 28, 2011

Robert J. Conrad, Jr.
Chief United States District Judge